Filed 7/7/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LILIANA ESPEJO et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>THE COPLEY PRESS, INC.,<br><br>    Defendant and Appellant. | D065397<br><br><br>(Super. Ct. Nos. 37-2009-00082322-CU-OE-CTL, 37-2010-00085012-CU-OE-CTL) |

APPEALS from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge. Judgment affirmed in part, reversed in part and remanded with directions.

Cooley, Steven M. Strauss, Seth A. Rafkin, Summer J. Wynn and Heather C. Meservy for Defendant and Appellant.

Callahan & Blaine, Daniel J. Callahan, Michael J. Sachs, Jill A. Thomas and Scott D. Nelson; Cadena Churchill and Raul Cadena for Plaintiffs and Appellants.

Defendant The Copley Press, Inc., owner of the San Diego Union-Tribune newspaper (collectively UT), appeals from a second amended and restated judgment (the judgment) after a court trial in this class action brought by and on behalf of persons whom UT formerly engaged as newspaper home delivery carriers (plaintiffs or carriers).

The main issue at trial was whether the carriers were employees of UT or independent contractors. The trial court decided the carriers were employees.

UT contends (1) the plaintiff class must be decertified because the class representatives were inadequate; (2) the court committed reversible error by not limiting the trial to certified issues and by granting plaintiffs' motion to amend their second amended complaint according to proof; (3) the class should be decertified and the judgment reversed because the court did not and could not manage individualized issues; (4) the court's order bifurcating plaintiffs' cause of action under Business and Professions Code section 17200[1] to be tried first deprived UT of its right to a jury trial; (5) the class award must be reversed because UT paid carriers enhanced compensation that reimbursed them for expenses the court awarded; (6) the amounts the court awarded were not restitution; (7) the court erred in awarding plaintiffs prejudgment interest; (8) substantial evidence does not support the court's determination that the carriers were employees rather than independent contractors; (9) the court erred in awarding plaintiffs attorney fees under Code of Civil Procedure section 1021.5;[2] (10) even if attorney fees could be awarded, the court erred by not substantially reducing them for limited success; and (11) the court erred by adopting plaintiffs' lodestar amount in awarding attorney fees.

---

[1]     Subsequent references to section 17200 are to Business and Professions Code section 17200.

[2]     Subsequent references to section 1021.5 are to Code of Civil Procedure section 1021.5.

Plaintiffs appeal the portion of the judgment awarding them attorney fees, contending (1) the court abused its discretion in not awarding an enhancement of the lodestar amount of their fees; and (2) the court erred in ruling they abandoned their cause of action for damages under Labor Code section 2802[3] and therefore could not recover attorney fees under that statute. We affirm in part and reverse in part the judgment with directions to redetermine the class award, attorney fees, and prejudgment interest as explained below.

FACTUAL AND PROCEDURAL BACKGROUND

The trial court (Judge Lisa Foster) certified a class consisting of "[t]hose persons who signed contracts directly with [UT] as newspaper home [d]elivery carriers of the San Diego Union-Tribune newspaper in the [S]tate of California between January 2005 and the present."[4] The carriers each signed a contract with UT entitled "Independent Contractor Distribution Agreement Home Delivery." The contract provided that the carrier owned and operated an independent business enterprise and was not an employee, and that the carrier and UT "fully and freely" intended to create an independent contractor relationship under the contract.

---

[3] Subsequent references to section 2802 are to Labor Code section 2802.

[4] The class period effectively ran from January 2005 through June 2007 because UT began phasing out direct-contract carriers in 2006 and as of July 1, 2007, there were no longer any direct-contract carriers delivering papers for UT. Judge Foster noted in the certification order that by the end of 2007, no carriers contracted directly with UT; they all contracted with third-party distributors.

3

The contract required the carrier to deliver each newspaper "in a clean, dry, undamaged and readable condition at a time and location" that met the subscriber's reasonable requests and expectations. The carrier agreed to complete deliveries by 5:30 a.m. on weekdays and 6:30 a.m. on Saturdays, Sundays, and holidays. The carrier could not directly or indirectly engage in the delivery, sale, or distribution of any other daily or Sunday newspaper in the San Diego area without UT's written consent.

UT paid carriers on a per-piece basis and provided for "[i]nsert [f]ees"—i.e., payment for putting inserts into newspaper—and fees for delivering publications other than the San Diego Union-Tribune, such as the USA Today and the Wall Street Journal. UT tracked subscriber complaints against a carrier by documenting the number of complaints per thousand deliveries (CPT) against the carrier. The contract provided that CPT's "regarding missed or late deliveries; or wet, stolen or damaged newspapers must not exceed 1.0. . . ." UT charged the carrier $4.00 for more than one CPT and $8.00 for more than two CPT's.

The contract required the carriers to obtain accident insurance to cover injury to the carrier or his or her substitutes or helpers, and bonding in the amount of $1,200 through a bonding company acceptable to UT. The minimum bonding for each route was $600, and the carrier could elect to obtain bonding with Wilson Gregory Agency, Inc., for $1.00 per month for each $600 in coverage, which would result in a monthly bond deduction of $2.00 from the carrier's pay.

Carriers picked up the newspapers they were to deliver each morning and "mail" (written communications, including delivery instructions) from UT at one of UT's

4

regional distribution centers. The carriers arrived at the distribution centers between 2:00 and 4:00 a.m. and spent about 45 minutes to an hour assembling their newspapers and preparing them for delivery. The contract required the carriers to assemble their papers at the distribution centers.[5] The carrier agreed to pay UT a distribution center fee and authorized UT to debit from the carrier's account "[i]nserting [f]ees" to compensate a third party for performing certain inserting services (putting inserts into the newspapers for the carriers).

Plaintiffs filed their original class action complaint in January 2009. Plaintiffs' second amended complaint, the operative complaint at trial, named UT and various other entities as defendants and included causes of action under the Labor Code for (1) failure to pay minimum wage and overtime wages; (2) failure to provide meal breaks or compensation in lieu thereof; (3) failure to provide rest periods or compensation in lieu thereof; (4) failure to reimburse for reasonable business expenses (§ 2802);[6] (5) unlawful deductions from wages; (6) failure to provide itemized wage statements; and (7) failure to

---

[5]     The court in its statement of decision stated: "The contract stated that the carriers were required to prepare and fold their newspapers in [UT's] distribution centers. . . ." Presumably, the court was referring the following language in the contract: "Contractor agrees to deliver publication (and any products therein) on the specified delivery day and to insert separate pieces and any other sections, inserts, or jackets that are part of that publication together prior to leaving [UT's] designated location."

[6]     Subdivision (a) of section 2802 provides: "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful."

keep accurate records. The second amended complaint also included an eighth cause of action under section 17200 for unfair business practices.

In 2011, plaintiffs filed a motion to certify a class defined as "[a]ll persons presently or formerly engaged by [UT] as newspaper home delivery carriers of The San Diego Union-Tribune newspaper in the [S]tate of California during the class period, whether engaged directly by [UT] or indirectly through its agents." UT (and other defendants) filed a motion to strike the class allegations from the second amended complaint and opposition to plaintiffs' motion to certify the class.

The trial court granted in part and denied in part plaintiffs' motion for class certification and UT's motion to strike class allegations. With respect to plaintiffs' fourth cause of action and sixth through eighth causes of action only, the court certified a class consisting of "[t]hose persons who signed contracts directly with [UT] as newspaper home [d]elivery carriers of The San Diego Union-Tribune newspaper in the [S]tate of California between January 2005 and the present." The court denied plaintiffs' motion for certification and "concurrently grant[ed] the motion to strike the class allegations, with respect to the large class for whom certification was sought by plaintiffs and with respect to the first, second, third and fifth causes of action." The court excluded from the class persons who contracted with third-party distributors to deliver The San Diego Union-Tribune rather than with UT directly.

In September 2012, plaintiffs filed a motion to bifurcate the trial, requesting that their eighth cause of action under section 17200 for unfair business practices (an equitable claim) be tried before their fourth cause of action under section 2802 for

6

reimbursement of business expenses (a legal claim). In that motion, plaintiffs conceded their sixth and seventh causes of action were time-barred because the limitations period for obtaining penalties under those causes of action had expired when plaintiffs filed their original complaint in 2009. Consequently, the fourth cause of action and eighth cause of action were the only remaining causes of action to be tried.

Plaintiffs argued that equitable claims generally should be tried before legal claims because doing so might dispense with the need to try the legal claims. Specifically, plaintiffs noted that the issue of whether they were employees of UT or independent contractors was the foundational issue under both remaining causes of action, and a determination that they were independent contractors would be dispositive of both causes of action. The court (Judge Gonzalo Curiel) granted the motion to bifurcate and ordered that plaintiffs' equitable cause of action for unfair business practices would be tried first as a bench trial before the trial of their legal claim for reimbursement of expenses under section 2802.

In January 2014, plaintiffs' counsel sent UT's counsel a letter stating: "Please be advised that it is our intention to seek all of the class members' damages in the . . . section 17200 cause of action. This includes, but is not limited to, mileage reimbursement, insurance, bonds, warehouse rent, bags and rubber bands, insert charges, carrier collect and complaint charges. We bring this to your attention since it was previously our intention to seek the mileage damages in the . . . section 2802 claim. However, since mileage reimbursement is a vested right once the miles are driven, it is also a recoverable item of damage under the section 17200 claim pursuant to *Cortez v.*

7

*Purolater Air Filtration Products Co.* (2000) 23 Cal.4th 163 [(*Cortez*)]."[7]  In December 2012, UT filed a pretrial motion to decertify the class.  The court denied the motion without prejudice.

The case was tried to the court in May and June of 2013.  After plaintiffs rested, UT moved for judgment under Code of Civil Procedure section 631.8 on the grounds the evidence proved the class representative who testified at trial, Genardo Valderrama, was an independent contractor, and plaintiffs had not met their burden of proving damages under section 2802.  UT also renewed its motion to decertify the class on the grounds Valderrama was not an adequate or typical class representative and plaintiffs had failed to put on "common proof."  The court denied both motions.  In addition to Valderrama's testimony, the court heard testimony from 12 other witnesses, including two expert witnesses and a number of present and former UT employees.

In December 2013, the court filed a statement of decision, in which it found "[p]laintiffs showed by a significant preponderance of the evidence that the carriers were, in fact, employees [of UT] and not independent contractors."  Accordingly, the court concluded plaintiffs were "entitled to recover under . . . section 17200."  The court rejected UT's defense that it had "provided enhanced compensation to the carriers such

---

[7]     The California Supreme Court in *Cortez* did not authorize recovery of *damages* in an action under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), as plaintiffs' counsel's letter suggests.  The *Cortez* court held that unlawfully held wages may be recovered as *restitution* in a UCL action, even though they might also be recovered as damages in a civil suit for breach of contract or fraud.  (*Cortez, supra*, 23 Cal.4th at pp. 173–178.)  The *Cortez* court confirmed that damages are not available under the UCL.  (*Id.* at p. 173.)

that it subsumed all of their expenses, including when gas prices spiked during the Class Period." In the statement of decision, the court granted plaintiffs' motion to amend their second amended complaint to conform to proof to include three "categories of damages they sought recovery for at trial" but did not specify in their complaint, namely, carrier collect charges, insert charges, and warehouse rent.

The court awarded plaintiffs restitution under section 17200 in the total amount of $3,188,445, consisting of business expenses in the following amounts: $2,280,059 for mileage reimbursement; $618,569 for poly bags and rubber bands; $74,014 for insurance premiums; $29,577 for bond premium; $116,430 for warehouse rent; and $69,796 for insert charges. The court denied recovery for carrier collect charges and complaint charges.

Plaintiffs' lead counsel and associate counsel filed separate motions for attorney fees under section 1021.5 and section 2802. The court ruled that plaintiffs were not entitled to fees under section 2802 because they had abandoned that cause of action, but the court granted the motions under section 1021.5. In June 2014, the court entered a final judgment awarding plaintiffs on their eighth cause of action the principal sum of $3,188,445 against UT, plus prejudgment interest at the rate of seven percent from January 1, 2006 to November 27, 2013, in the sum of $1,765,350.27 for a total award of $4,953,795.27. The judgment awarded attorney fees to plaintiffs and the class members

in the amount of $6,160,416, of which $1,250,000 was to be paid from the common fund—i.e., the class award.[8]

DISCUSSION

UT's Appeal

I. *Determination that the Carriers Were Employees and not Independent Contractors*

UT contends substantial evidence does not support the court's determination that the carriers were employees rather than independent contractors. We disagree.

The trial court's determination of employee or independent contractor status is one of fact if it depends upon the resolution of disputed evidence or inferences and, as such, must be affirmed on appeal if supported by substantial evidence. (*S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, 349 (*Borello*); *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 16–17 (*Estrada*).) The question is one of law only if the evidence is undisputed. (*Borello,* at p. 341.) "The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." (*Id.* at p. 349.)

"California decisions applying statutes enacted for the protection of employees 'uniformly declare that "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . ." [Citations.]' [Citation.] But courts 'have long recognized that the "control" test, applied rigidly and in isolation, is often of little use in

_____

8      The judgment also awarded costs to plaintiffs and incentive awards to the class representatives. Those awards are not challenged in this appeal.

10

evaluating the infinite variety of service arrangements.' [Citation.] So, while the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' [Citation.] Thus, ' "the right to discharge at will, without cause," ' is ' "[strong] evidence in support of an employment relationship. . . ." ' [Citation.] Additional factors include '(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.' " (*Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 426, quoting *Borello, supra*, 48 Cal.3d at pp. 350–351.)

Regarding the right-to-control test, "what matters under the common law is not how much control a hirer *exercises,* but how much control the hirer retains the *right* to exercise. [Citations.] Whether a right of control exists may be measured by asking ' " 'whether or not, if instructions were given, they would have to be obeyed' " ' on pain of at-will ' " 'discharge[ ] for disobedience.' " ' " (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 533 (*Ayala*).)

11

The trial court in its statement of decision identified the facts and evidence that supported its finding that the carriers were employees of UT. The court found that although the contract provided that the carriers were independent contractors, it was a contract of adhesion that the carriers entered into "on a take-it-or-leave it basis." The court cited testimony of former UT management employee Scott Zimmerman that a carrier never requested a new rate from him,[9] and Valderrama's testimony that there was no negotiation of rates he was to be paid, which were filled in when he was provided the contract. The court also cited evidence that the occasional rate increases the carriers received were not the result of negotiations with the carriers, but rather were "pragmatic business decision[s]" and an effort by some UT "distribution centers to determine whether the carriers were making similar compensation to occupations that competed with the pool of persons who worked as carriers."

The court noted that UT's carrier contract was revised 11 times during the class period, and that all of the revisions were unilateral by UT and for UT's sole benefit. As examples, the court cited a liquidated damages provision added to the contract in 2006 "on a take-it-or-leave it basis," and UT's unilateral decision to have carriers pay others to do the inserts for their Sunday papers. The court found credible Valderrama's testimony that there was no negotiation regarding any amendments or addendums to the contract.

---

[9] UT management employee Nancy Tetrault also testified that she was not aware of any prospective carrier asking at the time of contracting for a higher rate than the rates UT offered.

12

The court cited the following provisions in the contract that showed UT's right to control the carrier's manner and means of delivery: (1) the contract required the carriers to prepare and fold their newspapers in the distribution centers unless they had written waivers of that requirement; (2) the carriers could not insert messages into their papers with the exception of holiday cards; (3) the carriers could use only bags that were approved by UT; (4) the carriers could not add a delivery surcharge; (5) the carriers were required to deliver their papers by a specified deadline; (6) the carriers could not sell their subscriber lists; (7) the carriers had to be properly attired and wear closed-toed shoes in the distribution centers; (8) the carriers could deliver only publications authorized by UT; (9) the carriers could not assign their contracts; and (10) a carrier's compensation would be reduced if his or her CPT exceeded one.

There was evidence of certain control measures that the court incorrectly cited as contract provisions, including UT's requirement that the carriers prepare the papers in accordance with daily specifications that UT provided in order to comply with advertiser requests, and UT's policy that the carriers could not communicate directly with the home delivery subscribers.[10]

In addition to the contract, the court specified other evidence of control supporting its conclusion that the carriers were employees of UT, including "substantial testimony

---

[10] The court later in its statement of decision noted evidence apart from the contract that UT did not allow carriers to deal with customer complaints and were discouraged from communicating directly with customers, including testimony to that effect from Valderrama and Pierre Savoie, who worked for UT during the class period as a consumer distribution manager.

regarding [UT's] employees training, mentoring, and coaching carriers." Zimmerman testified about a comprehensive "Orientation Procedures" checklist that UT employees used to train new carriers. The checklist covered every aspect of the carrier's work, including warehouse safety, how to bill and maintain records for carrier-collect accounts, double bagging on rainy days, procedures at the distribution center, how Sunday procedures differed from weekday procedures, how and where to order and pick up supplies, how to interpret a route/delivery list, how to handle paper shortages, customer complaint procedures, and contractual obligations and procedures for using substitutes. The carrier's daily mail from UT included instructions specifying how particular customers wanted their papers delivered, and the carrier had to comply with those demands or risk being charged with a customer complaint.

The court noted Savoie's testimony that UT employees were evaluated on their training, mentoring, and supervision of carriers. Savoie also testified that UT sought to have uniform policies at the distribution center, including policies regarding the training of carriers.

The court referenced testimony of former UT employee Richard Conahan that UT set goals for employees to assist with carrier training and that employees mentored carriers, and the testimony of former UT employee Victor Diep, who testified that he trained carriers by taking them on their routes and showing them where to put the papers, how to read their daily mail and delivery instructions, and how to use a RouteSmart list, which was a computer program that provided specific instructions on delivering papers according to customer demands. The court also cited former UT employee Harold

14

Button's testimony about a UT "best practices" document, which was an interoffice memorandum that established uniform policies for dealing with carriers at UT's distribution centers.[11]

As additional evidence of UT's control of the carriers, the court noted that UT employees at the distribution centers watched over the carriers to make sure they were assembling their papers correctly and "would counsel, mentor, and supervise the carriers." The court specifically noted former UT management employee Phillip Prather's testimony that he would walk around his distribution center and make sure the carriers were assembling papers correctly, and Valderrama's testimony that UT employees supervised him while he was assembling papers at the distribution center. The court also noted "unrefuted" evidence that if carriers failed to arrive at their distribution centers in a timely fashion, UT employees would call them and sometimes go to a carrier's residence to wake up the carrier.

The court cited testimony by Zimmerman and Valderrama, whom the court found to be credible witnesses, that UT employees conducted audits and field checks of the carriers' deliveries to determine whether the papers delivered by the carriers had been prepared correctly, and Conahan's testimony that field checks were done on a regular basis. As additional evidence of UT's right to control the carriers, the court cited Savoie's testimony that the UT unilaterally changed carrier routes to satisfy advertisers who wanted their advertisements delivered to specific subscribers.

---

[11]    Zimmerman also testified about the "best practices" document.

15

The court found that the carriers delivered "alternate publications" (e.g. the New York Times and Wall Street Journal) under instructions from UT, and that "[t]here was no evidence that a carrier who did not want to deliver any or all of the alternate publications could have chosen to do so. Indeed, it was clear that the carriers had to deliver these publications, regardless of their preference." These findings are supported by Zimmerman's and Valderrama's testimony and the provision of the contract stating: "[UT] agrees to provide [the carrier] . . . with sufficient copies of publications other than *The San Diego Union-Tribune* . . . for delivery to locations designated by [UT], which may include *The San Diego Union-Tribune* subscriber stops and other designated stops." Valderrama initialed that provision in the appendix to his contract but testified that the carriers had no choice whether to sign contract addendums, stating, "We had to sign." Zimmerman testified that there was no negotiation on the alternate publication addendums. He stated, "I believe the first one was the *Los Angeles Times*, and we pretty much approached the carrier and said, 'You're going to have 12 weekly customers, and you might have 20 Sunday customers that are *Los Angeles Times*. . . .'"

The court cited the following as additional evidence of UT's right to control the carriers' work: the carriers had to purchase bonds and accident insurance from UT's broker; the carriers' invoices were prepared by UT rather than the carriers; and UT limited the carriers' right to use substitutes. The court cited evidence that if a nonfamily member substituted for a carrier, UT had to know who the substitute was and "when the substitute would be there." The court noted Zimmerman's testimony that UT routinely

16

obtained information about a substitute, particularly the substitute's name and phone number.

After discussing the evidence showing UT's right to control the carriers' manner and means of performing their work, the court addressed the secondary factors under *Borello* that showed the carriers were employees as follows:

(1) *The right to discharge at will*: The court noted that all of the carrier's contracts provided that the contract was terminable on 30 days' notice, indicating the contract was terminable at will. The contract also gave UT the right to terminate the contract immediately for a "material breach."

(2) *Whether the carriers were engaged in a distinct occupation or business*: The court initially addressed this factor by noting UT employees did the same job as the carriers. The court cited testimony that during the class period up to 10 percent of UT's home-delivery routes were delivered by UT employees, who delivered the routes in the same way as the carriers and used their own vehicles.[12] However, the employees were reimbursed for their mileage.

Later in its statement of decision, the court stated: "When the class members first applied to become carriers, they were not independent newspaper delivery businesses. They were people looking for a job. They did not have any fictitious business names or business licenses. The only thing [UT] required was that the carriers had a driver's

---

[12]   Savoie was asked whether at certain points during the class period "nearly 10 percent of the routes were open," meaning they were not assigned to a carrier and had to be delivered by UT employees. Savoie responded, "I don't believe it got that high, but it got high."

license, acceptable automobile insurance, and a Social Security card."  The court's findings were supported by testimony of Zimmerman and Savoie.

(3) *Provision of instrumentalities, tools, and place of work*:  The court found that the carriers had to use bags and rubber bands they purchased from UT.  The court stated: "The court supposes that the carriers may have been able to purchase bags and rubber bands from another source if they were acceptable to [UT], but there is no credible evidence that actually occurred.  Instead, the evidence showed carriers purchased their supplies from [UT], by filling out a required form."  The court cited testimony by Zimmerman that new carriers were provided a kit they purchased for one dollar to use while they were learning to be a carrier.  The kit provided the necessary supplies for the carrier's first month.  Valderrama testified that when he started working as a carrier for UT, he was told he was going to be buying rubber bands and plastic bags for the papers from UT.  When he asked if he could buy bags or rubber bands elsewhere, he was told by a UT management employee that he had to buy them from UT.  Zimmerman testified he was not aware of any carriers that bought supplies from anyone other than UT.

(4) *Delivery as part of UT's business*:  The court correctly noted it was undisputed that newspaper delivery is an integral part of UT's business.  Savoie testified to that effect.

(5) *Duration of services*:  The court noted the evidence showed a large percentage of carriers stayed contracted with UT for many years, which is indicative of employment status.  Zimmerman estimated that 25 percent of the carriers stayed four years or longer,

and there were carriers who had delivered for UT for decades.  He testified that the average amount of time a carrier would stay with UT was one to three years.

(6) *Investment in equipment*:[13]  The court correctly noted there was no evidence that the carriers had a substantial investment in their work other than their vehicles, which they also used for their personal needs.

The evidence discussed above sufficiently supports the court's finding that the carriers were employees of UT rather than independent contractors.  California case law also supports that finding.  As the court noted in its statement of decision, *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839 (*Antelope Valley*) is persuasive authority because the Court of Appeal in that case affirmed the insurance commissioner's determination, under facts similar to those presented here, that newspaper carriers were employees rather than independent contractors for purposes of workers' compensation insurance.  (*Id.* at pp. 842–843.)

Applying the substantial evidence test and the common law test for employment approved in *Borello*, the *Antelope Valley* court concluded there was substantial evidence that the Antelope Valley Press (AVP) controlled the manner and means by which its carriers accomplished their tasks, even though the form contract between AVP and the

---

[13]    In addition to the secondary factors noted above, the *Borello* court noted a "six-factor test developed by other jurisdictions. . . .  Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) *the alleged employee's investment in equipment or materials required for his task*, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business." (*Borello, supra*, 48 Cal.3d at pp. 354–355, italics added.)

19

carriers stated that the carrier " 'has the right to control the manner and means of delivery' of AVP's publications and 'has the right to determine the equipment and supplies needed to perform delivery services.' " (*Antelope Valley, supra*, 162 Cal.App.4th at p. 853.) Like UT, AVP permitted its customers to dictate where they wanted the papers placed on their property. (*Id.* at pp. 853–854.) Any harm to or loss of the paper could result in financial loss to the carrier, like the charges against the carriers for customer complaints in the present case. (*Id.* at p. 854.) The carriers in *Antelope Valley* had to abide by the pick up and delivery times specified in the contract or face economic consequences or termination. (*Ibid.*) AVP controlled the price paid by customers to AVP, which included the cost of the delivery service. (*Ibid.*)

The *Antelope Valley* court also concluded substantial evidence supported the finding that most of the secondary factors under *Borello* indicated an employer-employee relationship between AVP and its carriers. Like the carriers' contract in the present case, the carriers' contract in *Antelope Valley* provided that AVP could terminate the contract on 30 days' notice to the carrier, which provision the *Antelope Valley* court viewed as clearly giving AVP "the right to discharge at will without cause." (*Antelope Valley, supra*, 162 Cal.App.4th at p. 854.) The *Antelope Valley* court further noted the evidence did not show that in delivering AVP's publication, the carriers were engaged in a distinct occupation or business of their own; that any of the carriers held themselves out as being an independent delivery service that happened to have AVP as one of its customers; or that the carriers had a substantial investment in their AVP delivery duties other than their time and the vehicles they used, which were the same vehicles they used for their

20

personal activities. (*Id.* at pp. 354–355.) Similarly, there was no evidence in the present case that the carriers operated as independent newspaper delivery businesses with fictitious business names or business licenses or that the carriers had a substantial investment in their work other than their time and their vehicles, which they also used for their personal needs.

Other factors supporting the determination that the carriers in *Antelope Valley* were employees were that delivering newspapers required no particular skill; AVP supplied many of the materials used by the carriers, such as the newspapers, bags, and subscriber lists; and a large percentage of carriers had been contracted with AVP for a period of more than a year, unlike an independent contractor "hired to achieve a specific result that is attainable within a finite period of time, such as plumbing work, tax service, or the creation of a work of art for a building's lobby . . . ." (*Antelope Valley, supra*, 162 Cal.App.4th at p. 855.) The *Antelope Valley* court also noted that payment for the carriers was "essentially in a piecework fashion" and that delivery of its publications was "part and parcel of the newspaper business," as evidenced by the fact that AVP employees also delivered AVP's publications. (*Id.* at pp. 855–856.) Finally, the *Antelope Valley* court noted that although the carrier contract allowed the carriers to hire employees and substitutes, the contract limited that right in certain respects. (*Id.* at p. 856.) Each of these factors is also present in this case.

The instant case is also similar to *Gonzales v. Workers' Comp. Appeals Bd.* (1996) 46 Cal.App.4th 1584 (*Gonzalez*), in which the Court of Appeal applied the *Borello* right-to-control test in determining that a newspaper carrier was an employee of the newspaper

21

rather than an independent contractor for purposes of workers' compensation. The *Gonzalez* court noted the carrier "had very little control over the mode and manner in which he performed his service. [The newspaper] specified the time at which the newspapers were to be picked up for distribution and specified the time each day by which the newspapers were to be delivered to the customers. [The newspaper] furnished both the customers and the routes by which the customers were served. [The carrier] had almost no interaction with the customers, as the customers paid their subscription fees directly to [the newspaper] and rendered complaints about delivery directly to [the newspaper]. Although [the newspaper's] supervision of the performance of the services was indirect, it was focused on and totally responsive to the complaints received from customers." (*Id.* at p. 1593.) The *Gonzalez* court further noted that the newspaper could discharge a carrier at will (*ibid.*); the carriers made no capital investment aside from their vehicles; the publisher provided bags and rubber bands; newspaper delivery was a form of manual labor that required no special skill; newspaper delivery was an integral part of the newspaper's business operation; and "no finite time for service was involved as is normally the case with a true independent contractor relationship." (*Id.* at p. 1594.) Each of these circumstances described in *Gonzalez* is present in the instant case.

Finally, just as the trial court here found the carriers' form contract was not controlling on the issue of independent contractor/employment status because it was an adhesion contract that the carriers entered into "on a take-it-or-leave it basis," the *Gonzalez* court noted "there was no indication that [the carrier] had any real choice of terms of employment or contract." (*Gonzalez, supra*, 46 Cal.App.4th at p. 1594.) The

22

*Gonzalez* court concluded: "The totality of the circumstances substantiates the . . . conclusion that [the publisher's] carrier agreement, which purported to 'disavow' an employer-employee relationship, was a subterfuge to avoid the workers' compensation laws of California. 'The label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced.' " (*Ibid.*, quoting *Borello, supra*, 48 Cal.3d at p. 349.)

UT argues that *Antelope Valley* and *Borello* are inapposite because they were decided in the context of workers' compensation law. We disagree that the common law test discussed in *Borello* for determining an employment relationship is limited to workers' compensation cases. The California Supreme Court in *Borello* stated that its answer to the question of whether agricultural laborers engaged to harvest cucumbers under a written " 'sharefarmer' " agreement were independent contractors exempt from workers' compensation coverage had "implications for the employer-employee relationship upon which other state social legislation depends." (*Borello, supra*, 48 Cal.3d at p. 345, fn. omitted.)

In *Ayala*, the Supreme Court considered whether a complaint alleging that a newspaper publisher illegally treated its carriers as independent contractors and thereby deprived them of various administrative and statutory wage and hour protections could proceed as a class action. The *Ayala* court applied the *Borello* right-to-control test and secondary factors in considering "whether the operative legal principles, as applied to the facts of the case, render[ed] the claims susceptible of resolution on a common basis." (*Ayala, supra*, 59 Cal.4th at pp. 530, 531–540.) Finally, the Court of Appeal in *Estrada*

23

held that "[b]ecause the Labor Code does not expressly define 'employee' for purposes of section 2802, the common law test of employment applies." (*Estrada, supra*, 154 Cal.App.4th at p. 10.) The trial court did not err in applying the common law test discussed in *Borello* to determine whether the carriers were employees or independent contractors.

UT also argues the trial court erred in disregarding regulations adopted by the Employment Development Department (EDD) to define what constitutes an independent contractor relationship with a carrier in the newspaper industry. Specifically, UT contends that the court should have applied California Code of regulations, title 22, section 4304-6 (section 4304-6), which sets forth various factors to consider in determining whether a carrier is an employee or an independent contractor in newspaper distribution industry, and that had it done so, it would have concluded the carriers were independent contractors.

The court did not err in not specifically applying section 4304-6 to determine the employment status of the carriers. The EDD regulations expressly apply the same common law test for determining employment status articulated in *Borello*. (Cal. Code Regs., tit. 22, §§ 4304-1 & 4304-6.) Section 4304-6, subdivision (a) provides that "determination of whether a carrier is an employee or an independent contractor in the newspaper distribution industry will be determined generally by the rules set forth in [section] 4304-1 . . . ." California Code of regulations, title 22, section 4304-1 states: "Whether an individual is an employee for the purposes of [unemployment compensation] will be determined *by the usual common law rules applicable in*

24

*determining an employer-employee relationship*.  Under those rules, to determine whether one performs services for another as an employee, the most important factor is the right of the principal to control the manner and means of accomplishing a desired result.  If the principal has the right to control the manner and means of accomplishing the desired result, whether or not that right is exercised, an employer-employee relationship exists.  Strong evidence of that right to control is the principal's right to discharge at will, without cause."  Subdivision (a) of section 4304-1 lists the same factors to be considered in applying the right-to-control test that the *Borello* court listed. (*Borello, supra*, 48 Cal.3d at pp. 350–351.)

Section 4304-6, subdivision (c) sets forth "Basic Guidelines" or factors to be considered in determining the employment/independent contractor status of newspaper carriers, some of which evidence employment status and some of which evidence independent contractor status.  However, the factors listed in section 4304-6 are merely what they purport to be—i.e., *guidelines*; they do not establish an absolute test or compel a particular finding of employment or independent contractor status under particular circumstances.  The trial court was not required to specifically consider the section 4304-6 guidelines in making its employment status determination; it could properly make that determination by applying the common law factors set forth in *Borello* and section 4304-1.  Substantial evidence and California law supports the court's determination that the carriers were employees rather than independent contractors.

## II.  *Class Action Certification and Trial*

### A.  Adequacy of class representatives

25

UT contends the class must be decertified because the class representatives were inadequate. "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

Typically, "[t]he adequacy of representation component of the community of interest requirement for class certification comes into play when the party opposing certification brings forth evidence indicating widespread antagonism to the class suit." (*Capitol People First v. Department of Developmental Services* (2007) 155 Cal.App.4th 676, 696–697.) " 'It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent. But only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.' " (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.)

In the present case, there was no evidence of antagonism to the class suit by any class members. Thus, representation of the class was adequate as long as the representative(s) had claims typical of the class (*Brinker, supra*, 53 Cal.4th at p. 1021) and could "adequately represent the class by vigorously and tenaciously protecting the

26

class members' interests." (*Sharp v. Next Entertainment, Inc.* (2008) 163 Cal.App.4th 410, 432.) A relevant factor in the latter analysis is "the competency of class counsel, if the firm is representing the class as a whole and not simply the interests of the named representative plaintiffs [citations], and if the named plaintiffs have lent their names to litigation that is controlled by class counsel." (*Id.* at p. 433.)

Here, plaintiffs' counsel represented the entire class; class counsel's competency is not at issue; and nothing in the record suggests the named representatives through counsel did not vigorously and tenaciously advance the class members' interests throughout the litigation. In the order certifying the class, the court stated: "With respect to the claims the Court has certified for class treatment, the class representatives satisfy the typicality requirement. None of the UT's arguments in this regard undermine plaintiffs' showing that the class representatives['] claims arise from the same events, practices and course of conduct that give rise to the claims of the other class members. [Citation.] *Similarly, the Court finds that class counsel unquestionably are qualified to conduct the proposed litigation on behalf of the class.*" (Italics added.)

Because UT contends that the class representatives were inadequate at trial and asks that we decertify the class on appeal, we also consider the legal principles that apply to a motion to decertify a class. "After certification, a trial court retains flexibility to manage the class action, including to decertify a class if 'the court subsequently discovers that a class action is not appropriate.' [Citations.] To prevail on a decertification motion, a party must generally show 'new law or newly discovered evidence showing changed circumstances. [Citation.] A motion for decertification is not an opportunity for a

27

disgruntled class defendant to seek a do-over of its previously unsuccessful opposition to certification. "Modifications of an original class ruling, including decertifications, typically occur in response to a significant change in circumstances, and '[i]n the absence of materially changed or clarified circumstances . . . courts should not condone a series of rearguments on the class issues[.]' [Citation.]" ' [Citation.] A 'class should be decertified "only where it is clear there exist changed circumstances making continued class treatment improper." ' " (*Kight v. CashCall, Inc.* (2014) 231 Cal.App.4th 112, 125–126.) We find no significant change in circumstances between the time the class was certified and the time of trial that would support our decertifying the class or reversing the judgment on the ground of inadequacy of the class representatives.

In arguing that the class representatives were inadequate and, therefore, the class must be decertified, UT relies on the following three cases for the proposition that class representatives are inadequate if they merely lend their name to a lawsuit controlled entirely by class counsel: *Howard Gunty Profit Sharing Plan v. Superior Court* (2001) 88 Cal.App.4th 572 (*Gunty*), *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133 (*Soderstedt*), and *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986 (*Jones*). UT complains that five of the six class representatives did not testify at trial and the one who did, Valderrama, was inadequate because he was generally uninformed about the case and did not consent to be a class representative.

*Gunty* is inapposite. The trial court in *Gunty*, in ruling on a motion to certify a class in an action against a banking corporation for fraud and unlawful market manipulation, ruled that the proposed representative plaintiff—a profit sharing plan—was

28

not an adequate representative because it was a " 'professional plaintiff' "[14] and was not typical of the class.  (*Gunty, supra*, 88 Cal.App.4th at p. 575.)  The main issues before the Court of Appeal were whether the plaintiffs should be allowed to send a letter to potential class members soliciting a new class representative, whether such a communication is constitutionally protected by the First Amendment as commercial speech, and whether defendants should be allowed to send a letter urging potential class members not to participate.  (*Id.* at pp. 576–577.)  The *Gunty* court discussed recent increased concern over potentially meritless securities lawsuits filed by professional plaintiffs (*id.* at p. 578), the potential for misuse and abuse of the class action procedure (*id.* at p. 579), and the potential for abuse inherent in precertification communication (*id.* at p. 580).  Concerned that the trial court had not weighed these potential abuses against the rights of the parties, the *Gunty* court remanded the matter and directed the trial court to conduct a hearing on plaintiffs' motion to certify the class and, if it determined the plaintiffs had "established a prima facie proper class action," to then determine what controls, if any, it should impose on the parties' communications to potential class members.  (*Id.* at pp. 580–581.)

In the present case, there is no evidence that Valderrama or any of the other class representatives is a professional plaintiff.  Valderrama testified that he had read the complaint, and that after he spoke to plaintiffs' counsel about the lawsuit, he decided he wanted to be a part of it.  When UT's counsel asked him if plaintiffs' counsel offered to

---

14     The *Gunty* court explained that " '[t]he term professional plaintiff generally is used to refer to a plaintiff who is either a frequent filer . . . or a "hired gun" (one who allows an attorney to sue in his name in exchange for a fee), or both.' "  (*Gunty, supra*, 88 Cal.App.4th at p. 575, fn. 2.)

pay him "something depending on how this lawsuit turns out," he testified that he was told he "might get partial for whatever . . . the amount is, and everyone else will. That was it." Counsel then asked, "So you were told that you might get something out of this lawsuit if it's successful?" Valderrama responded, "Yes, sir." He further testified that he was not told he would recover a specific amount and had not been paid anything so far. The fact that plaintiffs' counsel discussed with Valderrama the lawsuit's potential to result in a monetary recovery *for the entire class* does not make Valderrama a professional plaintiff. *Gunty* does not compel the conclusion that Valderrama and the other class representatives were inadequate.

Nor does the fact that Valderrama was the only class representative who testified at trial render the other representatives inadequate. Valderrama's testimony describing his daily routine and the various aspects of his work for UT as a carrier was largely cumulative to the testimony of UT's present and former management employees who testified about the carriers' work and how they were trained and managed. Nothing in the record suggests the class members' interests were harmed by the failure of other class representatives to provide additional cumulative trial testimony about their experiences as carriers for UT.

*Soderstedt* and *Jones* were appeals from orders denying class certification motions. In *Soderstedt*, the trial court found the appellants failed to meet their evidentiary burden of showing they were adequate class representatives because their declarations did not show they desired to represent the putative class or understood the

obligations of being an adequate representative.[15]  In affirming the denial of class

certification, the *Soderstedt* court concluded "[s]ubstantial evidence supported the trial

court's finding that appellants failed to meet their burden to show they were adequate

class representatives."  (*Soderstedt*, *supra*, 197 Cal.App.4th at p. 156.)  However, the

*Soderstedt* court observed that the same evidence (declarations) on which the trial court

based its finding of inadequacy of the representatives could also have reasonably

supported the opposite finding—i.e., that the proposed representatives *could* adequately

represent the class.[16]

In *Jones,* the trial court denied class certification based in part on its finding that

the proposed class representative (Jones) was not an adequate class representative

because he had not filed his own "declaration in support of the motion and therefore

failed to show that he understood his fiduciary obligation owed to the class. . . ."  (*Jones,*

---

15     The appellants' declarations in *Soderstedt* each stated:  " 'I have been actively involved in this litigation for its entire duration.  I am regularly in contact with my counsel.  I have assisted counsel in responding to discovery requests.  I understand that as a Class Representative, I must assist counsel in prosecuting the action on behalf of the Class.  I have made myself available to date, and will continue to do so and to represent the interests of absent class members to the best of my ability.' "  (*Soderstedt, supra*, 197 Cal.App.4th at p. 155.)

16     The Court of Appeal stated:  "Although it may have been reasonable on the basis of [the appellants' declarations] for the trial court to have concluded that appellants would adequately represent the interests of the absent class members, that does not mean the trial court's contrary conclusion was necessarily unreasonable."  (*Soderstedt, supra*, 197 Cal.App.4th at pp. 155–156.)

*supra*, 221 Cal.App.4th at p. 992.)[17] Although the *Jones* court reversed the order denying the class certification motion, it concluded substantial evidence supported the trial court's finding that Jones was not an adequate representative. (*Id.* at p. 998.)[18]

Thus, the *Soderstedt* and *Jones* courts did not set forth definitive requirements for adequacy of class representation; they simply decided the trial court could reasonably find the representative was inadequate based on the evidence before it—i.e., that substantial evidence supported the trial court's finding. As noted, the *Soderstedt* court observed that the trial court could also have reasonably made the opposite finding. We conclude the trial court here could reasonably find the class representation was adequate, as the trial court could have done in *Soderstedt*. We find no basis to decertify the class or disturb the judgment on the ground the class was not adequately represented.

B. <u>Trial of claims specified in plaintiffs' fourth cause of action</u>

UT contends the trial resulted in abuse of the class action procedure because the court allowed plaintiffs to litigate claims that were not certified for class treatment. Plaintiffs disagree with UT's view of the scope of the class certification order. There was much argument and discussion between the parties and the court over this issue at trial.

---

17    Plaintiffs' counsel filed a declaration on Jones's behalf stating that Jones had reviewed the complaint and understood the basic theories of the case and his role as a class representative. (*Jones, supra*, 221 Cal.App.4th at p. 998.)

18    The *Jones* court concluded that the trial court was required to allow the plaintiffs an opportunity to amend their complaint to name a suitable class representative. (*Jones, supra*, 221 Cal.App.4th at p. 999.)

The fourth cause of action of plaintiffs' operative second amended complaint sought reimbursement of reasonable business expenses under section 2802 and related administrative regulations, and specified the following five categories of business expenses: (1) vehicle expenses (gasoline, maintenance, and insurance); (2) charges for customer complaints; (3) plastic bags, strings, and rubber bands; (4) insurance to cover accidental injury on the job; and (5) the cost of a bond to secure the carrier's performance. The fifth cause of action for "Unlawful Withholding of Wages Due" under Labor Code sections 221 and 223 and related regulations sought recovery of the same expenses specified in the fourth cause of action, with the exception of vehicle expenses—i.e., it sought recovery of "illegal deductions" for customer-complaint charges; plastic bags, strings, and rubber bands; workers' compensation insurance; and surety bonds. As noted, Judge Foster struck and denied certification as to the fifth cause of action.[19]

---

[19] The certification order did not explain and it is unclear why the court (Judge Foster) struck the fifth cause of action. As noted, the court struck the first, second, third, and fifth causes of action. The court's explanation of that portion of its ruling indicated it struck those causes of action because it concluded they required proof that was too individualized for class treatment, but the court's explanation specifically addressed only the first, second, and third causes of action for failure to pay minimum and overtime wages, failure to provide or compensate for meal breaks, and failure to provide or compensate for rest periods, respectively. The court discussed "how individualized the determination of liability for minimum wage violations and overtime violations [would] be," and noted the "same [individual] questions make certifying the class on the second and third causes of action problematic." The court concluded that "determining whether there will be any liability for overtime pay, minimum wage violations, rest periods or meal breaks will necessarily involve a myriad of individual inquiries making class certification inappropriate." The court did not explain why litigating the fifth cause of action for unlawful wage deductions would be too individualized for class treatment.

33

In her written certification order, Judge Foster certified the class as to the fourth cause of action and referred to that cause of action as "the Fourth cause of action—failure to pay reimbursement for auto expenses . . . ."  UT contends this language clearly shows Judge Foster certified the fourth cause of action only as to the claim for auto expenses and not the other categories of expenses specified in that cause of action.  UT also reasons that by denying certification as to and striking the fifth cause of action, Judge Foster intended that plaintiffs' claims for any expenses that were specified in both the fourth and fifth causes were not certified for trial, leaving only the claim for vehicle expenses within the scope of class certification.

We disagree with UT's interpretation of the certification order.  Read in context, the order's reference to "the Fourth cause of action—failure to pay reimbursement for auto expenses" is reasonably read as merely exemplifying that plaintiffs' business expense claims were susceptible to proof on a classwide basis.  In that paragraph, Judge Foster began by "agree[ing] with plaintiffs" that the certified (fourth and sixth through eighth) causes of action were amenable to class treatment and, to exemplify, addressed the fourth and sixth causes of action as follows:  "For example, if plaintiffs establish that the carriers properly should have been classified as employees, then without question, they will prevail on liability for . . . failure to provide an itemized wage statement.  The UT either did or did not provide each class member with an itemized wage statement.  The UT does not contend that it provided wage statements to some carriers but not to others.  Similarly, with respect to the Fourth cause of action—failure to pay

reimbursement for auto expenses, there is no dispute the UT did not reimburse plaintiffs for auto expenses. If the carriers are found to be employees, the UT will be required to reimburse plaintiffs for automobile-related expenses. The only question is one of damages."

Thus, Judge Foster did not expressly rule that the reimbursement/unlawful deduction claims common to the fourth and fifth causes of action were too individualized for class treatment and that her certification of the fourth cause of action was limited to the claim for vehicle expenses.[20] Her reference to that claim is reasonably interpreted as simply intending to illustrate that plaintiffs' claims for reimbursement of business expenses were not too individualized to be litigated on a classwide basis. In any event, the court at trial exercised its discretion to allow plaintiffs to litigate all of their business expense claims notwithstanding any language in Judge Foster's certification order indicating a contrary intent. During extended argument over the scope of the certification order and whether litigation of the fourth cause of action was limited to vehicle expenses, the court (Judge Meyer) stated: "I'm not going to allow this issue to get me off track. This case is going, and these [business expense claims] are items of damage[.]"

[¶] . . . [¶] "[A]nd . . . I'm not going to be necessarily limited by Judge Foster's

---

20    In a later hearing before Judge Foster regarding notice to class members, Judge Foster indicated she did not intend to limit certification of the fourth cause of action to vehicle expenses by stating, in reference to the proposed notice's description of the class claims: "I don't have an issue with how the claims are described. It—the court did reference mileage. *I'm not sure there are other expenses that might not properly be encompassed within those claims.*" (Italics added.) During argument over this point at trial, the court (Judge Meyer) noted that Judge Foster's certification order did not expressly limit litigation of the fourth cause of action to auto expenses only.

determination.  This is my case, not hers, with all due respect to Judge Foster.  And I'm going to make the same determination that she made:  If there is . . . an expense that is easily determinable on a classwide basis, fine.  If it's not, it's not going to be considered."

"Trial courts are afforded broad discretion when managing class actions [citation], and we presume the correctness of their rulings unless an abuse of discretion is shown." (*In re BCBG Overtime Cases* (2008) 163 Cal.App.4th 1293, 1301–1302.)  We find no abuse of discretion in the court's allowing plaintiffs to litigate all of their expense reimbursement claims.

C.  <u>Amendment to conform to proof to add claims not alleged in the second amended complaint</u>

UT contends the court committed reversible error by granting, in its statement of decision, plaintiffs' motion to amend their second amended complaint to conform to proof to include claims for three categories of business expenses—carrier collect charges, insert charges, and warehouse rent—for which they sought recovery at trial but did not identify in their second amended complaint.

" '[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused.  [Citations.]  Such amendments have been allowed with great liberality "and no abuse of discretion is shown *unless by permitting the amendment new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced* [citation]."  (Italics added.)  [Citations.]' Conversely, ' "amendments of pleadings to conform to the proofs should not be allowed

36

when they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend." ' " (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 909, quoting *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) We see no reason why a trial court has any less discretion to allow amendment of a pleading to conform to proof in a class action than in other civil actions. (See *Town of New Hartford v. Conn. Res. Recovery Auth.* (Conn. 2009) 970 A.2d 592, 625–628 [trial court in certified class action did not abuse its discretion in allowing posttrial amendment of complaint to conform to proof]; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1348 [trial court may alter or amend a class certification order before a decision on the merits].)

We find no abuse of discretion in the trial court's allowing plaintiffs to amend their second amended complaint to include claims for carrier collect charges, insert charges, and warehouse rent because plaintiffs sought recovery of the carriers' business expenses through their fourth cause of action and as restitution under their eighth cause of action, and the record shows that UT had ample notice of those specific claims and the opportunity to defend against them. On January 14, 2013, plaintiffs' counsel wrote a letter to UT's counsel stating their "intention to seek all of the class members' damages in the Business & Professions Code section 17200 cause of action. This includes, but is not limited to, mileage reimbursement, insurance, bonds, *warehouse rent*, bags and rubber bands, *insert charges*, *carrier collect* and complaint charges." (Italics added.) At an ex parte hearing in February 2013, UT's trial counsel acknowledged receiving that letter and that plaintiffs were seeking those categories of damages. In a letter dated March 13,

37

2014, plaintiffs' counsel again listed the "categories of damages" plaintiffs would seek at trial, including warehouse rent, insert charges, and carrier collect charges, and informed the court of those categories at a trial management conference on March 29, 2013. UT defended against all of the reimbursement claims during trial, including the claims for warehouse rent, insert charges, and carrier collect charges.[21]

Before UT put on its defense, the court addressed whether it would be proper to allow amendment of the second amended complaint to include plaintiffs' claims to recover carrier collect charges, insert charges, and warehouse rent, noting that "generally amendments according to proof are accorded a lot of liberality" and that the court had not been cited a case that a different rule applies to class actions. The court observed: "[T]he question is, have you had an opportunity to defend at trial. And there is evidence that even though the [s]econd [a]mended [c]omplaint didn't specifically identify those three same components, in the several years that this case has been pending, you have been put on notice that that's what the class would be claiming. So it would be manifestly unjust to, at trial, say, we didn't know anything about this, when the evidence is that you cross-examined their expert, you argued in front of Judge Foster, blah, blah . . . you didn't ask for a continuance . . . . The usual arguments against amending according to proof." The court's observation about UT's notice of and opportunity to defend against plaintiffs' claims to recover carrier collect charges, insert charges, and warehouse rent was accurate.

---

[21]    As noted, the court denied recovery for carrier collect charges.

Thus, the court acted within its discretion in allowing amendment of the second amended complaint to include those claims.

    D.  Bifurcation

UT contends the court's order bifurcating plaintiffs' cause of action under section 17200 to be tried first deprived UT of its right to a jury trial. We find no error in connection with the bifurcation order and conclude UT waived the right to challenge the order and was not prejudiced by it.

Plaintiffs first moved to bifurcate in February 2012, and UT opposed the motion, arguing it was premature and should be denied without prejudice because it was more appropriately the subject of later case management conferences addressing a comprehensive trial plan. The court denied the motion without prejudice.

In September 2012, plaintiffs again moved to bifurcate the trial, requesting that their eighth cause of action under section 17200 for unfair business practices (an equitable claim) be tried before their fourth cause of action under section 2802 seeking reimbursement of business expenses (a legal claim). Plaintiffs argued that equitable claims generally should be tried before legal claims because doing so might dispense with the need to try the legal claims. Specifically, plaintiffs noted that the issue of whether they were employees of UT or independent contractors was the foundational issue under both causes of action and a determination that they were independent contractors would be dispositive of both causes of action. UT again opposed the motion, arguing it was still premature and should be denied without prejudice because it would more appropriately be decided as part of a case and trial management plan. The court

39

(Judge Gonzalo Curiel) granted the motion to bifurcate and ordered that plaintiffs' equitable cause of action for unfair business practices would be tried by the court before the trial of their legal claim for reimbursement of expenses under section 2802.

As noted, plaintiffs' counsel sent UT's counsel a letter in January 2013 stating plaintiffs' "intention to seek all of the class members' damages in the . . . section 17200 cause of action." At an ex parte hearing in February 2013, the parties and the court (Judge Meyer) discussed Judge Curiel's bifurcation order. The court suggested that the threshold issue of whether the carriers were employees or independent contractors was a jury question. Plaintiffs' counsel responded, "No, [Y]our [H]onor. It's been bifurcated so that's going to be a [section] 17200 action. That's why it was bifurcated because I think . . . it would be in the best interest of everyone to have that determined first." However, plaintiffs' counsel asserted that plaintiffs were not waiving a jury trial. The court asked what a jury would decide and plaintiffs' counsel responded, "Damages, [Y]our [H]onor."

The court then asked whether the employee-independent contractor determination was going to be made by the court or by a jury. UT's counsel responded, "Court, [Your] [H]onor. We're in agreement on that." The court then asked, "You're waiving jury on that determination?" UT's counsel responded, "It's not a jury issue." The court again asked what the jury was going to decide, and plaintiffs' counsel said, "[section] 2802, if your honor decides that we can't recover all under [section] 17200." The court said, "All right. So it looks like we have got a bench trial." UT's counsel stated, "Looks like a bench trial, [Y]our [H]onor."

40

At a trial management conference in March 2013, UT's counsel informed the court the parties "wanted to revisit this question with you as to whether it's a judge or jury trial. And the dispute on that issue appears to be this question of whether the auto expenses would be considered restitution under [section] 17200." UT's counsel stated that "if [the court] were to determine that, then I'm led to believe there wouldn't be a jury." UT's counsel later said he was "not sure the jury [trial] is buried yet," explaining that if the court were to determine in a bench trial on plaintiffs' section 17200 claim that plaintiffs were not entitled to restitution, "then they want a second shot to a jury. *And I would like to see us avoid second shot [i.e., jury trial], and I think you would too.*" (Italics added.) The court responded: "I don't care. . . . I mean . . . *if you're entitled to a jury, I'm the last one to keep you from getting it.* What would you want a jury to do? To decide what?" Plaintiffs' counsel stated that "the only thing that would be left for a jury to decide would be what the mileage is if [Y]our Honor decides that mileage is not recoverable under [section 17200]." Plaintiffs' counsel stated he was "happy to have [the court] decide [the mileage claim]." UT's counsel stated, "If the plaintiffs are saying no jury. Then we'll present that to our client, *but I'd recommend it, too*, and then at least we know we have a bench trial . . . , and we have a little more flexibility on how to do it because we've done this a few times."

"[A]n appellant waives [the] right to attack error by expressly or implicitly agreeing or acquiescing at trial to the ruling or procedure objected to on appeal." (*In re Marriage of Broderick* (1989) 209 Cal.App.3d 489, 501.) It is clear from the record that UT acquiesced to bifurcation of plaintiffs' section 17200 claim and expressed its

41

preference for a court trial on that claim. The record reflects the parties' and the court's understanding that because plaintiffs elected to seek their entire recovery as restitution under their section 17200 cause of action, a jury trial on their section 2802 cause of action was unnecessary.[22] Accordingly, UT waived the right to challenge the bifurcation order on appeal and, in any event, has not shown or even argued that it was prejudiced by the order or the resulting trial by the court instead of a jury.[23]

---

[22] On appeal, UT asserts that it repeatedly objected that it was being deprived of a jury trial. However, UT provides no citation to the record to support that assertion and we are unable to find anything in the record that supports it. UT could have requested a jury trial but did not do so. As noted, the court stated that "if you're entitled to a jury, I'm the last one to keep you from getting it."

[23] UT's reason for raising the bifurcation issue appears to be a concern that if plaintiffs are allowed to seek statutory attorney fees under section 2802 despite having sought their monetary award solely under section 17200, UT will have been deprived of a jury trial that could have occurred had plaintiffs not decided to seek their recovery under section 17200 instead of section 2802. This concern is a nonissue because plaintiffs were not and will not be awarded attorney fees under section 2802.

E.  Challenges to class award

UT contends, generally, that the court erred in relying on individualized evidence to make classwide determinations and that certain components of the class award reflect the court's failure to properly manage the class trial.[24]  UT raises the following specific challenges to the court's monetary award to the class:

1.  *Enhanced-compensation defense*

UT contends the court erred in awarding the class expenses that UT had already reimbursed by paying the carriers enhanced compensation to cover their vehicle expenses and other expenses.  UT argues that in rejecting its enhanced-compensation defense, the court misconstrued and misapplied *Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554 (*Gattuso*).

---

[24]    Regarding individualized evidence supporting classwide findings, UT specifically complains that the court in its statement of decision cited testimony of Valderrama and Zimmerman as support for the following findings:  the carriers did not negotiate their pay rate and other contract terms; UT used an "orientation" checklist in training and dealing with carriers; UT employees supervised carriers in the distribution centers and made sure they were assembling the newspapers correctly; carriers were discouraged from communicating directly with other customers; there were audits and field checks of the carrier's deliveries; and new carriers were provided a kit that they purchased for one dollar to use while they were learning to be a carrier.

The court reasonably relied on Zimmerman's and Valderrama's testimony to make these findings, over which there was little or no dispute, and most were corroborated by testimony of other witnesses.  E.g., Savoie testified that UT would not allow carriers to negotiate hourly rates or lump-sum payments and warehouse fees were not negotiated, and that carriers were told not to tell customers to call them with complaints; Savoie testified that field checks were done "through the whole market" every day; Conahan and Diep also testified that UT employees regularly conducted field checks, and UT zone manager Nancy Tetrault testified that carriers were prohibited from distributing any communications to customers other than holiday greetings and billing notices.

43

Section 2802, subdivision (a) requires an employer to indemnify its employees for all necessary expenditures they incur in discharging their duties. The California Supreme Court in *Gattuso* held that an employer may satisfy its obligation under section 2802 to reimburse employee business expenses by paying employees enhanced compensation in the form of increases in base pay or commission rates, provided that (1) the employer establishes some method or means to apportion the enhanced compensation to identify what portion is intended as expense reimbursement; and (2) the identified reimbursement amounts are sufficient to reimburse employees for all expenses they necessarily incurred. (*Gattuso, supra*, 42 Cal.4th at pp. 558, 575.)

UT argues that *Gattuso* does not require employers to give employees the apportionment information to identify expense reimbursement at the time it pays the enhanced compensation; it requires only that the employer provide the employee the information upon request, if the employee challenges the enhanced compensation as insufficient. We disagree with UT's interpretation of *Gattuso* and conclude *Gattuso* requires that the employer communicate to employees the method or means of identifying the portion of compensation that is intended to provide expense reimbursement at or near the time of compensation.

The *Gattuso* court explained that providing the employee the means of identifying the portion of compensation intended to reimburse expenses enables employees and officials charged with enforcing state and federal wage laws to "*readily* determine whether the employer has discharged all of its legal obligations as to both wages and business expense reimbursement. Although section 2802 does not expressly require the

44

employer to provide an apportionment method, it is essential that employees and officials charged with enforcing the labor laws be able to differentiate between wages and expense reimbursements. Because providing an apportionment method is a *practical necessity for effective enforcement* of section 2802's reimbursement provisions, it is implicit in the statutory scheme." (*Gattuso, supra*, 42 Cal.4th at p. 573, italics added.)

This language implies that the method of identifying the amount of compensation intended to reimburse expenses must be provided at or near the time of payment. If the apportionment method is revealed only through litigation or some other challenge to the sufficiency of the expense reimbursement, employees and enforcement officials would not be able to "readily determine" whether the employee is being sufficiently reimbursed under section 2802. The *Gattuso* court's reference to the provision of the apportionment method as being a "practical necessity for effective enforcement" further implies that the apportionment method must be reviewable at or near the time of payment, because it would be impractical to require enforcement officials to review undisclosed apportionment methods. If officials are required to demand from employers disclosure of apportionment methods that may or may not be readily available, they would not be able to *readily* determine whether the employer is sufficiently reimbursing expenses under section 2802.

Moreover, in later reiterating that employers must provide a means of apportioning between wages and expense reimbursement, the *Gattuso* court stated that "an employer that uses salary and/or commission increases to discharge its reimbursement obligation *must also communicate to its employees* the method or basis for apportioning any

increases in compensation between compensation for labor performed and business expense reimbursement. Such a requirement . . . is necessary for effective enforcement of section 2802's reimbursement provisions and, thus, implicit in the statutory scheme." (*Gattuso, supra*, 42 Cal.4th at p. 574.) The Supreme Court's directive that employers *communicate* the apportionment method to employees is inconsistent with UT's view that an employer is required to disclose the apportionment only if an employee challenges the sufficiency of the amount intended to reimburse expenses.

Considering the *Gattuso* court's recognition that the employer's *communication* of an apportionment method is a "practical necessity" to enable employees and enforcement officials to "readily determine" whether the employer has satisfied the reimbursement obligation of section 2802, we conclude *Gattuso* requires communication of the apportionment method to employees in the course of business—i.e., at or near the time of compensation— and not only if and when the employer is called upon to communicate its apportionment method in the face of a demand or legal claim. As one federal court noted, "*Gattuso* is clear . . . that a lump sum payment only satisfies an employer's obligations if the employee is given sufficient information to determine what part of his salary constituted 'wages' and what part was for the reimbursement of expenses. *There is no authority to suggest that this obligation is satisfied if that information only becomes available through litigation, nor would such a rule comport with the reasoning of Gattuso. Whether the [trier of fact] will be able to easily calculate the amount of the lump sum payments using information that was not available to [employees] prior*

*to . . . litigation . . is not the issue.*" (*Villalpando v. Exel Direct Inc.* (N.D.Cal. 2016) 161

F.Supp.3d 873, 887 (*Villalpando*), italics added.)[25]

UT argues the evidence shows it satisfied *Gattuso*'s apportionment requirement,

citing evidence that it factored anticipated business expenses, included route mileage,

into the amount it paid its carriers and communicated that fact to the carriers; that the

carriers' contracts listed the delivery and insert fees UT paid; and that the carriers'

monthly invoices "detailed every reversal, credit and fee for every carrier." This

evidence does not show that UT complied with *Gattuso*'s requirement of communicating

to carriers an apportionment method that enabled the carriers to readily determine the

---

[25]     In arguing that it was not required to provide carriers the apportionment information required to identify expense reimbursement at the time it paid the carriers, UT notes that the *Gattuso* court stated: "*In the future*, employers that provide business expense reimbursement to employees through increases in base salary or commission rates should, in providing the [itemized wage statement] documentation required by [Labor Code] section 226, subdivision (a), separately identify the amounts that represent payment for labor performed and the amounts that represent reimbursement for business expenses." (*Gattuso, supra*, 42 Cal.4th at p. 574, fn. 6.) UT contends this "forward-looking instruction" does not apply here because the class period ended before the California Supreme Court decided *Gattuso*. UT further notes that the quoted language in *Gattuso* addresses satisfying Labor Code section 226, not section 2802, and there is no section 226 claim in this case.

    We view the *Gattuso* court's advice to employers to provide expense reimbursement information in wage statements as simply a recommendation of an obvious and relatively simple way to comply with the court's apportionment requirement in the future; the *Gattuso* court did not say there was no current or past requirement that employers provide some means to apportion compensation between pay for labor and expense reimbursement to prevail on an enhanced-compensation defense. "The requirement in [Labor Code s]ection 226 that employers separately *identify the amounts* that represent payment and reimbursement is separate from the requirement that an employer communicate to its employees the *method or basis* for apportioning any increases in compensation between compensation for labor and expense reimbursement." (*Aguilar v. Zep Inc.* (N.D.Cal., Oct. 10, 2013, No. 13-CV-00563-WHO) 2013 WL 5615688, at p. 7.)

47

amount of their pay that was intended to reimburse expenses. The cited evidence shows only that UT communicated that expenses were factored into the amount of compensation and occasionally may have shared certain information that it considered in determining pay to certain carriers; it does not show that the carriers were generally provided a means of determining how much of their gross pay was intended to reimburse expenses.

UT suggests that the deductions from gross pay listed on the carriers' monthly invoices serve as a breakdown of the amount of enhanced compensation that was intended to cover those expenses. However, the invoices did not communicate that the carriers were being reimbursed or compensated in the amount of the deductions stated on the invoices. In *Smith v. Cardinal Logistics Management Corp.* (N.D.Cal., Aug. 19, 2009, No. 07-2104SC) 2009 WL 2588879, a class action seeking expense reimbursement under section 2802, an employer similarly argued that amounts appearing as expense deductions on weekly statements issued to delivery truck drivers should be construed as reimbursements because the drivers' compensation rates factored in their projected expenses. (*Id.* at p. 3.) The court found that the employer's compensation system did not satisfy *Gattuso*'s requirements for expense reimbursement through enhanced compensation because there was no lump-sum payment that included a means of identifying the amount being paid for labor performed and the amount being paid as reimbursement for business expenses, and the only payment the drivers received occurred after expenses had already been deducted. (*Id.* at p. 4.) The court concluded "[t]his system of compensation is too far removed from what the California Supreme Court had

48

in mind.  The Court will not treat it as equivalent to the lump-sum payment method endorsed by the California Supreme Court in *Gattuso.*"  (*Ibid.*)

The court in *Villalpando* discussed the above analysis in *Smith* and concluded that while the employers in both cases were not required to pay twice for employee expenses, they could not meet their obligations under *Gattuso* "by simply stating that their [pay] rate covers these expenses; they must provide their employees with a means of determining whether these assertions are true."  (*Villalpando, supra*, 161 F.Supp.3d at p. 886.)  The court concluded that absent any evidence that class members could have determined that their unreimbursed expenses or the expenses that were later deducted from their pay were actually included in their gross pay, that the employer could not prevail on an enhanced compensation defense under *Gattuso.*  (*Id.* at p. 887.)

Similarly, the carriers' invoices in the present case did not set forth a lump-sum payment that included a means of identifying the amount being paid for labor performed and the amount being paid as *reimbursement* for business expenses, and the only payment the carriers received occurred after various expenses had already been deducted. Moreover, Savoie testified that UT's policy was to explain to carriers that *they* were responsible for their expenses and that the fees they were paid were "the gross fee minus any expenses that they incur through [UT], but that they're going to be responsible." Savoie also acknowledged that there was no breakdown on carriers' invoices of the amount carriers were being compensated for auto expenses.

49

UT argues that even if it did not satisfy *Gattuso*'s requirements, equity requires reversal of the judgment and remand to reconsider crediting UT for its payment of enhanced compensation. Although plaintiffs elected to seek recovery of their business expenses as restitution under section 17200, the court properly held UT to *Gattuso*'s requirements for an enhanced-compensation defense to a section 2802 claim because section 2802 was the predicate statute for plaintiffs' cause of action under section 17200. We recognize that the trial court has broad discretion to fashion equitable remedies under the UCL (*Cortez, supra*, 23 Cal.4th at p. 180), but conclude the court may not exercise its equitable powers to disregard the requirements of section 2802 as construed by *Gattuso*—i.e., to effect an end run around *Gattuso*.

UT asserts that business expenses under section 2802 are not recoverable as restitution under section 17200. We disagree. "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] . . . Section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq." (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838–839.)

An order for payment of wages unlawfully withheld from an employee is a restitutionary remedy authorized by the UCL. (*Cortez, supra*, 23 Cal.4th at pp. 177–178.) The term "wages" includes not only an employee's periodic monetary earnings but also other benefits to which the employee is entitled as part of compensation. (*In re*

50

*Work Uniform Cases* (2005) 133 Cal.App.4th 328, 337–338 (*Uniform Cases*).)  In

*Uniform Cases*, the plaintiffs sought reimbursement under section 2802 for the cost of

work uniforms.  (*Id.* at p. 332.)  The *Uniform Cases* court concluded that "payment to

employees for work uniforms is a part of the employees' compensation and should be

considered like any other payment of wages, compensation or benefits."  (*Id.* at p. 338.)

Accordingly, an employee's recovery of unlawfully withheld expenses under section

2802 is a proper restitutionary remedy under the UCL.  (See *Harris v. Best Buy Stores,*

*L.P.* (N.D.Cal., Aug. 1, 2016, No. 15-CV-00657-HSG) 2016 WL 4073327, at p. 10 [UCL

claim may be maintained to the extent it is predicated on plaintiff's section 2802 claim];

*Ordonez v. Radio Shack* (C.D.Cal., Feb. 7, 2011, No. CV 10-7060 CAS (MANx)) 2011

WL 499279, at p. 6 [UCL claim may be maintained to the extent it is predicated on

plaintiff's claim under Labor Code, § 221 and section 2802].)  The court did not err or

misapply *Gattuso* in rejecting UT's enhanced compensation defense.

  2. *Reversals and credits*

  UT contends the court ignored individualized issues and improperly awarded

amounts already paid to carriers in the form of credits and reversals on their invoices.  It

is important to note that the issue of whether specified credits and reversals on carrier

invoices should be credited to UT in fashioning a restitutionary award is different from

the issue of whether alleged *enhanced compensation* as a component of gross pay is

properly viewed as reimbursement for business expenses under section 2802 and

51

*Gattuso*.[26]  We conclude the court erred in failing to take into account clearly specified credits, reversals, and payments to carriers in the business expense categories at issue in determining the amount of restitution to award plaintiffs.

"There must be evidence that supports the amount of restitution necessary to restore to the plaintiff 'any money . . . which may have been acquired by means of such unfair competition.' (§ 17203.)  The Supreme Court has made clear that the 'object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' [Citations.]  Thus, 'restitutionary awards encompass quantifiable sums one person owes to another. . . .' " (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 697–698.)  "[R]estitution under the [UCL] must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." (*Id.* at p. 698.)  "That the trial court may have discretion as to whether to order restitution as a remedy [citation] does not mean that when it does, it may select an amount unsupported by evidence." (*Ibid.*; *In re Tobacco Cases II* (2015) 240 Cal.App.4th 779, 792–793 [restitution award under the UCL must be supported by substantial evidence; thus, the trial court's broad discretion to grant equitable relief does not extend beyond the parties'

---

26      At the hearing in which the court orally announced its intended decision, the court indicated that it viewed the issue of whether UT was entitled to offset the monetary award to plaintiffs by the amounts of reversals and credits as an enhanced compensation issue governed by *Gattuso*.  UT's counsel offered to provide the court with a report showing all of the gas credits and incentives UT gave the carriers.  The court stated, "No, I don't think *Gattuso* allows it[,]" and "I think *Gattuso* says if you pay enhanced compensation, you do it at your peril, unless you do it the right way."

52

evidentiary showing].) Accordingly, a restitutionary award based on a failure to reimburse business expenses improperly charged to a plaintiff cannot properly include specific quantifiable charges and expenses that the defendant credited back or otherwise reimbursed to the plaintiff.

As evidence of the business expenses plaintiffs sought to recover, plaintiffs' counsel prepared a spreadsheet entitled "Unreimbursed Non-Mileage Expense Detail," on which it entered every debit or charge in each of the subject expense categories on 16,559 carrier invoices and color coded the charges by category. Counsel then added the charges to arrive at the total amount of unreimbursed expenses in each category for the entire class. However, Ruth Ortega, an employee of plaintiffs' counsel who prepared the spreadsheet, testified on cross-examination that she was instructed to list only charges and not to include any credits or reversals on the invoices.

Plaintiffs' accounting expert James Skorheim took the total amounts from the spreadsheet and prepared a summary that set forth the total amount in each expense category by month. Skorheim testified that his summary included only charges and no credits. He admitted that the carrier invoices specified credits and reversals, but his analysis did not take any of them into account. He testified, "If counsel asked me to assume that only the charges are actual in this case and that credits are irrelevant, then I do my calculation based upon the assumption that's asked of me. And that's what I did in this case."

Carrier invoices that UT presented showed credits and reversals in every nonmileage expense category, including bags and rubber bands, insurance, bonds, warehouse rent, insert charges, carrier collect, and complaint charges. Plaintiffs' restitution award must be recalculated to account for these credits and reversals.

Plaintiffs contend that it was UT's burden to produce evidence proving the amount of any set off it claimed, and it failed to do so. The record shows that UT did produce the evidence of the credits and reversals that should have been taken into account in calculating plaintiffs' restitution award, and they cross-examined plaintiffs' witnesses Ortega and Skorheim about the credits and reversals. What UT did not do is add up all the credits and reversals and present the court with a total amount in each expense category, which would have been helpful.[27] However, UT's failure to total the credits is not fatal to its right to have them taken into account. UT met its evidentiary burden by showing that the same documentary evidence that plaintiffs and the court used to calculate the award includes the amounts of credits and reversals by which the court should have reduced the award. When an offsetting credit or reversal is clearly specified on the same invoice that specifies a charge to be included in a restitution award, the court

---

[27]     UT's financial analyst Anthony Basilio answered "yes" when asked on cross-examination if he had the ability to add up credit reversals, at which point UT's counsel suggested it was unnecessary to do so because it was plaintiffs' burden to prove damages.

cannot properly ignore the offsetting credit and impose only the charge against the defendant, because such an award would not be supported by the evidence.[28]

In sum, plaintiffs' award should be reduced by the amount of any documented and readily identifiable payments, credits, or reversals that the class members received in the subject expense categories. Although the court properly declined to credit UT with payment of the carrier's business expenses through enhanced compensation because UT did not meet *Gattuso*'s requirements for an enhanced-compensation defense, *Gattuso* does not preclude UT from being credited with the credits and reversals specified on carrier invoices and other relevant documents in the calculation of plaintiffs' monetary award.

3. *Mileage award*

UT contends the judgment's mileage award is flawed because the proof of the mileage driven by the carriers is "impossibly individualized" and plaintiffs did not account for the gas and service incentives and credits that UT provided to the carriers. We conclude the method of calculating the mileage award that the court accepted was permissible. However, in accordance with our discussion above regarding the other expense categories, we conclude that the mileage award must be recalculated to take into

---

[28]    As noted, UT's counsel offered to provide the court with a report showing all of the gas credits and incentives. If the court had decided to take all of the specifically documented credits and reversals into account in calculating plaintiffs' award, the court could have directed UT's counsel to provide the necessary total amounts from the documentary evidence, and presumably will do so on remand.

account any documented credits or payments for gasoline, including any service incentives that UT can show were tied to compensation for gas.[29]

As explained by their expert Skorheim, plaintiffs calculated the total mileage driven by class members during the class period by first identifying the mileage of each route that class members operated based on Savoie's deposition testimony and exhibits that he produced at his deposition. For each month of the class period, plaintiffs determined the routes that were operated by a class member and routes that were being operated fully or partially by a nonclass member, such as a UT employee covering a route that was not assigned to a carrier. Plaintiffs excluded the miles that were driven by nonclass members, calculated the daily mileage driven by class members during the class period, and multiplied the total daily mileage driven by class members by the number of days in the class period to arrive at a total number of miles driven by class members during the class period.[30] Skorheim then broke down miles driven by class members for

---

[29] UT presented evidence of gasoline reimbursement in the form of gas credits, addendums, and payments. At trial, the court asked UT's counsel if they had been able to quantify gas credits. Counsel responded that gas credits and certain service incentive credits could be added and totaled, but admitted that they could not total the amounts paid through gas cards given to carriers, stating, "We don't have records of when people were given gas cards. That's not in the invoices. They were handed physical gas cards that they can take to the [gas station]. We don't have evidence of that." Again, UT's counsel offered to provide the court with a report showing all of the gas credits and incentives UT gave the carriers, representing "it's just something under [$]200,000 if you consider that as an offset from mileage."

[30] Based on Savoie's deposition testimony, Skorheim testified that the carriers drove an average of 7,000 miles per day, and that there were "somewhere around 600 routes" with an average distance of 11 miles per route.

each month of the class period and "applied the IRS mileage rate for the applicable month to determine the . . . estimated mileage expense."

UT complains that the mileage award based on the IRS mileage rate is only an estimate, and cites *Estrada* for the proposition that estimates and educated guesses are not allowed unless the amount cannot be proven. (*Estrada, supra*, 154 Cal.App.4th at p. 20 [estimates and educated guesses are not allowed where damages are susceptible of *exact proof*].) We conclude the court properly allowed plaintiffs to establish vehicle expenses on a classwide basis through their expert's reasonable estimate of the mileage driven by the carriers during the class period because the *actual* mileage driven by class members was not susceptible of exact proof. The total mileage driven by carriers during the class period could not be calculated with mathematical precision for the reasons UT argues proof of vehicle expenses was not amenable to proof on a classwide basis—i.e., plaintiffs could not establish how much a particular carrier actually drove during a given time period because many carriers used substitutes.

Generally, "the law tolerates more uncertainty with respect to damages than to the existence of liability. 'Uncertainty of the *fact* whether any damages were sustained is fatal to recovery, but uncertainty as to the *amount* is not.' " (*Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1, 40.) "[W]here the *fact* of damage has been established, the precise *amount* of the damage need not be calculated with absolute certainty. 'As long as there is available a satisfactory method for obtaining a reasonably proximate estimation of the damages, the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical

57

precision.' " (*DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 562.)

We further note that the remedial nature of overtime compensation laws "militates in favor of a reasonably expeditious means of calculating and distributing classwide aggregate damages if individual adjudication of the entitlements of all class members, or a substantial portion of the members, would impose impossible burdens on the courts and litigants." (*Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 751.) Appellate " 'review of a trial court's plan for proceeding in a complex case is a deferential one that recognizes the fact that the trial judge is in a much better position than an appellate court to formulate an appropriate methodology for a trial.' " (*Ibid.*) The remedial nature of section 2802 requiring employee compensation for reasonable business expenses likewise militates in favor of a reasonably expeditions methodology for calculating the class mileage award in this case, because calculating the exact actual mileage driven by each class member during the class period would impose an impossible burden. The court acted within its discretion in adopting plaintiffs' methodology for calculating the mileage award.

Regarding the IRS mileage rate, we note that *Gattuso* implicitly approved use of that rate by recognizing that employers may use either the mileage reimbursement method or the actual expense method of vehicle expense reimbursement under section 2802 (*Gattuso, supra*, 42 Cal.4th at pp. 568–569), and that the parties in that case agreed that "section 2802 permits use of the IRS mileage rate to calculate automobile expense reimbursement under the mileage reimbursement method." (*Gattuso,* at p. 569.) The

58

court did not abuse its discretion in adopting the IRS mileage rate to arrive at a reasonably proximate estimation of the carrier's vehicle expenses during the class period.

Although we conclude the general method of calculating the mileage award that the court adopted was permissible, as we discussed, the mileage award must be recalculated to take into account any documented credits or payments for gasoline, including any service incentive credits that UT can show were given to the carriers as compensation for gas.

4. *Insert charges*

UT paid carriers insert fees or credits to compensate for their putting inserts into newspapers, but also charged carriers an insert fee to compensate third parties to assemble their Sunday papers, which are the largest papers of the week. The insert charges and credits were both specified on the carriers' monthly invoices. On some invoices, the total amount of insert charges exceeded the total amount of insert credits; on others the amount of insert credits exceeded the amount of insert charges.

As an alternative to awarding the class the total amount of insert charges with no reduction for insert credits ($849,000, including interest), plaintiffs' counsel asked the court to award 14 percent of that total amount or $118,992.[31] Counsel explained that the 14 percent figure was based on a declaration by Savoie in which he cited one page of a single carrier invoice on which there was a 14 percent difference between the insert charge of $9.99 and insert credits totaling $8.64. The court accepted plaintiffs' 14 percent

---

[31]     Fourteen percent of $849,000 is actually $118,860.

59

analysis but did not want to include interest in its base award.  Based on plaintiffs' counsel's representation that the total amount of insert charges without interest was $498,543, the court awarded 14 percent of that amount or $69,796.

In its statement of decision, the court stated:  "The Court will not allow inserting charges as Section 2802 damages.  This was a benefit to the class that allowed the class members to not have to spend Saturday afternoon or Saturday at midnight to assemble[] their papers.  However, the Court does recognize that the carriers had to pay some money out of pocket to use the inserters.  The Court allows recovery of 14% of the insert charges under . . . Section 17200.  This equals $69,796."

UT contends that the award for insert charges should be reversed because (1) the court expressly found the insert charges were not necessary business expenses under section 2802; and (2) the amount awarded is not supported by the evidence because it is arbitrarily based on a single invoice out of 16,559 invoices issued to class members during the class period.  Assuming, without deciding, that the court had authority to award restitution for insert charges under section 17200 notwithstanding its finding that those charges were not recoverable under the sole predicate statute for plaintiffs' section 17200 cause of action, we conclude the insert-charge award must be reversed on the ground it is not supported by substantial evidence.

The court's 14 percent calculation was based on charges and credits for *a single week* on a *single* monthly invoice of a *single* carrier.  There is no evidentiary basis for a finding that the single invoice on which the court based the award represented even a reasonable estimate of the difference between insert charges and credits for that carrier

60

over the entire class period, let alone for the entire class. Our review of carrier invoices in the record confirms that insert credits on some invoices exceeded the amount of insert charges. Plaintiffs did not meet their burden of proving the class was entitled to a monetary recovery for insert charges.

5. *Time period of award*

The class period began on January 29, 2005. Without citation to authority, UT contends the class award impermissibly includes charges on the carriers' February 2005 invoices that were incurred in January 2005 before the class period began. Plaintiffs respond that the award properly includes the charges in question on the carriers' February 2005 invoices because that is when the charges were actually incurred—i.e., when UT actually deducted the money from the carriers' payments.

Plaintiffs cite no legal authority for their position, but cite their expert Skorheim's testimony that "when an invoice is issued, . . . at least from an accounting standpoint, that's when the charge takes place . . . ." Skorheim further explained, "I excluded all invoices that were presented to a carrier before January 29, 2005. Similarly, I excluded all invoices that were presented to the carrier after the end of the . . . class period, which would include a large part of . . . July of 2007." Thus, under UT's view of the class period, invoices presented in the first month of the class period would be excluded, but invoices presented the month following the last month of the class period would be *included*. As the trial court observed, "So it's a wash." As long as invoices issued in either the first month of the class period or the month following the last month of the class period were excluded, UT was not prejudiced.

61

We conclude the court properly adopted plaintiffs' view that the charges (and credits) to be taken into account in calculating the class award were properly those that appeared on invoices issued during the class period, because the recoverable charges occurred when they were actually deducted from the carriers' pay. This view accords with the general rule that "[w]hen damages are an element of a cause of action, the cause of action does not accrue until the damages have been sustained." (*City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 886; see *Phillis v. City of Santa Barbara* (1968) 264 Cal.App.2d 781, 787 [if charter amendment was unconstitutional insofar as it authorized any deduction from city employee's salary, employee had a cause of action for unpaid balance of his salary each time he received a pay check from which a deduction had been made].)

6. *Prejudgment interest*

UT contends the court erred by including prejudgment interest in the class award because section 17200 does not authorize prejudgment interest, all of the amounts awarded were unliquidated, and equitable considerations weigh against an award of prejudgment interest.

Courts ordinarily award prejudgment interest under Civil Code section 3287, subdivision (a), which provides: "A person who is entitled to recover *damages* certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day. . . ." (Italics added.) However, the UCL does not authorize an award of prejudgment interest and "Civil Code section 3287, subdivision (a) . . . is inapplicable [to

a UCL claim] because it governs recovery of *damages*. . . . [U]nder the UCL a plaintiff is entitled to injunctive relief and restitution, but *not* damages." (*M & F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1538 (*M & F Fishing*.)

Although a court may not award prejudgment interest under Civil Code section 3287, subdivision (a), to a restitutionary award under the UCL, the court nevertheless has discretion in equity to award prejudgment interest on a UCL award as a component of restitution. (*M & F Fishing, supra*, 202 Cal.App.4th at p. 1539; *Rodriguez v. RWA Trucking Company, Inc.* (2013) 238 Cal.App.4th 1375, 1411; *People v. Beaumont Inv., Ltd.* (2003) 111 Cal.App.4th 102, 132, 139 [affirming order awarding restitution of rents charged to tenants in unlawful long-term leases plus prejudgment interest on those amounts].) The policy underlying an award of prejudgment interest is to make the injured party whole for the accrual of wealth that could have been produced during the period of loss. (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1790.)

Accordingly, the court in *Wallace v. Countrywide Home Loans, Inc.* (C.D.Cal. April 29, 2013, No. SACV 08-1463-JST (MLGx) 2013 WL 1944458 (*Wallace*) ruled that prejudgment interest on UCL claims was a form of restitution necessary to fully compensate plaintiffs. (*Id.* at pp. 7–8.) The *Wallace* court explained that " '[t]he object of restitution [under the UCL] is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.' [Citation.] Restitution under the UCL is not limited to money that was once in the plaintiff's possession but also includes money in which the plaintiff had a vested interest. [Citation.] 'The intent of the section is to make whole, equitably, the victim of an unfair practice.' " (*Id.* at p. 7.) "Thus,

63

prejudgment interest on wrongfully withheld wages is the property of the employee from whom the wages have wrongfully been withheld, because, had the employee been in possession of the withheld wages, he would have been able to earn interest on those wages. Not awarding prejudgment interest on the withheld wages fails to restore the status quo and make the victim of the withheld wages whole." (*Id.* at p. 8.) We agree with the *Wallace* court's analysis and conclude it applies equally to wrongfully withheld reimbursement of employee business expenses, which, as we discussed *ante*, are a part of employees' compensation that "should be considered like any other payment of wages, compensation or benefits." (*Uniform Cases, supra*, 133 Cal.App.4th at p. 338.)

We further conclude that where, as here, an award of prejudgment interest is a matter of the trial court's equitable discretion, the requirement under Civil Code section 3287, subdivision (a), that damages be "certain, or capable of being made certain by calculation" does not apply. Civil Code section 3287, subdivision (b), allows a court, in its discretion, to award prejudgment interest on *unliquidated* damages,[32] whereas an award of prejudgment interest under subdivision (a) is mandatory. (*Watson Bowman Acme Corporation v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293 [trial court has no discretion under subdivision (a) of Civil Code section 3287—it must award prejudgment interest from the first day there exists both a breach and a liquidated claim].)

---

[32] Civil Code section 3287, subdivision (b), provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed."

A corollary of the principle that a court has discretion to award prejudgment interest on unliquidated claims is that where the court has discretion in equity to award prejudgment interest, it may do so on claims that are not liquidated. The certainty requirement of Civil Code section 3287, subdivision (a) applies only to *mandatory* awards of prejudgment interest under that subdivision.[33]

In the present case, the court made it clear it was exercising its equitable discretion to award prejudgment interest, stating: "[Y]ou can say that [UT] profited from the money because they had earned interest. I mean, just from an equitable standpoint, they get their money back plus interest. That's just fair." The court later stated, "Well, the court's visceral reaction, and I think it's pretty obvious, is under the facts of this case, it would be inappropriate to not award the plaintiffs interest just because that's the way people get compensated. *If you take their money or make them pay for something that they didn't have to pay for, they get interest for the money that they no longer have that they were entitled to.*" In other words, plaintiffs were entitled to recover interest they could have earned on the class award had that money not been wrongfully withheld. The court's oral explanation of its discretionary decision to award prejudgment interest accords with the principle that prejudgment interest is a necessary component of restitution. The court did not abuse its discretion in awarding prejudgment interest at the rate of seven percent in accordance with article XV, section 1 of the California Constitution, which provides: "In

---

[33]    Although the trial court's discretionary award of prejudgment interest in this case does not require liquidated claims, we note the court's award of business expenses in all of the categories except vehicle expenses is capable of being made certain by totaling the relevant credits and reversals on the carriers' invoices.

the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the state shall be 7 percent per annum."

UT contends the court erred in awarding prejudgment interest from January 1, 2006, instead of September 21, 2011, the date of the certification order. We find no abuse of discretion in the court's decision to award prejudgment interest from January 1, 2006. As noted, the class period effectively ran from January 2005 through June 2007. UT's counsel argued that interest should begin to accrue when the lawsuit was filed or on July 1, 2007, when UT stopped contracting directly with carriers. Plaintiffs' counsel argued that beginning interest accrual in 2007 would be unfair because "most of the damages were incurred in 2005 and then a little bit in 2006, and by 2007, most of the change had occurred." The court decided to compromise and award prejudgment interest from January 1, 2006. The court explained, "The problem is you're both taking positions that just benefit you. [Plaintiffs are] taking the earliest possible date, and [UT is] taking the latest possible date, and I'm just, frankly, sick of that, and I'm just going to try to do something in the middle, so that's it."

The court's compromise was reasonable. "[T]he trial court's discretion to award restitution under the UCL is very broad." (*People v. Beaumont Inv., Ltd., supra*, 111 Cal.App.4th at p. 135, citing *Cortez, supra*, 23 Cal.4th at p. 180.) As one court observed, " 'when necessary in order to arrive at fair compensation, the court in the exercise of a discretion may include interest or its equivalent as an element of damages.' If the trial court can, within its discretion, allow interest for the whole period, it can also allow interest for only a part of the period." (*National Union Fire Ins. Co. of Pittsburgh, Pa. v.*

66

*California Cotton Credit Corp.* (9th Cir. 1935) 76 F.2d 279, 291 [interpreting Civ. Code, § 3287].) We will not disturb the trial court's decision to award prejudgment interest from January 1, 2006, although the court will have to recalculate the amount of prejudgment interest based on the redetermined amount of the class award.

### III. *Attorney Fee Award*

UT contends the court erred in awarding attorney fees under section 1021.5 because plaintiffs failed to meet the requirements for fees under that statute. UT additionally contends the court improperly awarded fees to plaintiffs for both successful and unsuccessful claims that were unrelated; the court should have reduced the fee award for plaintiffs' limited success even if the successful and unsuccessful claims were related; and the court erred by adopting plaintiffs' lodestar amount in awarding attorney fees. We conclude the court did not abuse its discretion in awarding attorney fees under section 1021.5 or in adopting plaintiffs' lodestar amount. However, as we explain, we remand with directions to reconsider the attorney fee award in light of the possible reduction of plaintiffs' monetary recovery and to determine whether plaintiffs' limited success requires reduction of the fee award.

"We review an attorney fee award under section 1021.5 generally for abuse of discretion. Whether the statutory requirements have been satisfied so as to justify a fee award is a question committed to the sound discretion of the trial court, unless the question turns on statutory construction, which we review de novo." (*Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 152 (*Collins*).) " 'An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances,

the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.]  This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law.  We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' "  (*Id.* at p. 153.)

"Section 1021.5 authorizes an award of attorney fees 'to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest,' provided that three additional conditions are satisfied: '(a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.'[34]  (§ 1021.5.)  All of the statutory requirements must be satisfied to justify a fee award."  (*Collins, supra*, 205 Cal.App.4th at p. 153.)

"The necessity and financial burden requirement encompasses two issues: ' " 'whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.' "  [Citation.]' [Citation.]  Private enforcement is necessary only if public enforcement of the 'important right affecting the public interest' (§ 1021.5) at issue is inadequate.  [Citation.]  The trial

---

34    In a footnote at this point the court noted that section 1021.5 codifies the private attorney general doctrine.

court's finding that plaintiffs had satisfied the statutory requirements necessarily implies a finding that private enforcement was necessary. . . .

"The financial burden of private enforcement concerns not only the costs of litigation, but also the financial benefits reasonably expected by the successful party. [Citation.] The appropriate inquiry is whether the financial burden of the plaintiff's legal victory outweighs the plaintiff's personal financial interest. [Citations.] An attorney fee award under section 1021.5 is proper unless the plaintiff's reasonably expected financial benefits exceed by a substantial margin the plaintiff's actual litigation costs. [Citation.] The focus in this regard is on the plaintiff's incentive to litigate absent a statutory attorney fee award. ' "[S]ection 1021.5 is intended to provide an incentive for private plaintiffs to bring public interest suits when their personal stake in the outcome is insufficient to warrant incurring the costs of litigation.' " [Citations.]

"The successful litigant's reasonably expected financial benefits are determined by discounting the monetary value of the benefits that the successful litigant reasonably expected at the time the vital litigation decisions were made by the probability of success at that time. [Citations.] The resulting value must be compared with the plaintiff's litigation costs actually incurred, including attorney fees, expert witness fees, deposition costs and other expenses." ' " (*Collins, supra*, 205 Cal.App.4th at pp. 154–155, fn. omitted.)

As noted, in reviewing the trial court's attorney fee award for abuse of discretion, " '[w]e presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*Collins, supra*, 205 Cal.App.4th at

69

p. 153.)  Accordingly, "[w]e presume the trial court . . . was aware of the requirements of section 1021.5 and specifically of the requirement that 'the necessity and financial burden of private enforcement . . . [be] such as to make the award appropriate.' " (*Vasquez v. State* (2008) 45 Cal.4th 243, 259.)

The trial court's order awarding attorney fees reflects that the court fully understood and considered the requirements for an award under section 1021.5 and properly analyzed and applied the statute's financial burden requirement.  The court noted the statutory requirements for the award and set forth the correct analysis under case law for determining whether the financial burden requirement is satisfied, noting it was required to consider the estimated value of the case at the time the vital litigation decisions were being made, rather than plaintiffs' actual recovery, and compare that amount to actual litigation costs.

The trial court referenced two points in time when "plaintiffs were making vital litigation decisions as to whether there was sufficient inventive to move forward with this litigation."  The earliest of these was when the court ruled on the class certification motion.  The certification order, in the court's words, "gutted a large part of the class envisioned and proposed. . . .  Once the class certification motion was heard, the litigation fees and costs were out of proportion to plaintiffs' stake in the matter."  The court found that plaintiffs' second vital litigation decision was the "strategic decision to proceed on the Bus. & Prof. §17200 claim in order to obtain a larger statute of limitations.  This decision resulted in a much greater recovery for the class, but presented a real possibility that attorney fees would be limited to 25% of any recovery to the class."  Noting that the

70

fees plaintiffs' counsel earned in obtaining recovery for the class amounted "to at least $5 million," the court concluded:  "To require counsel to recover fees from the common fund alone would be a financial disaster."  The court expressly found "private enforcement" was necessary and that the financial burden of private enforcement warranted subsidizing plaintiffs' counsel.

The court reasonably found the financial burden requirement for section 1021.5 was satisfied from the point in time when it granted class certification.  As noted, plaintiffs' cost of litigation includes attorney fees, expert witness fees, deposition costs, and other expenses.  (*Collins, supra*, 205 Cal.App.4th at p. 154.)  Considering that the court's attorney fee award alone was $5,847,875, the trial court could reasonably find that plaintiffs' actual litigation costs substantially exceeded the financial benefits they reasonably expected to obtain from litigation.[35]

UT argues that if the financial burden requirement was not met at the outset of the litigation but was met later, attorney fees should be awarded only from the point when the financial burden element was met.  UT relies on *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 (*Protective League*), in which the Court of Appeal limited an award of attorney fees under section 1021.5 on remand to fees the

---

[35]    Plaintiffs represent in their respondents' brief that their costs of litigation totaled $8,757,137.43.  That figure is the sum of the amount of unenhanced attorney fees and costs plaintiffs' counsel Callahan & Blaine requested in their motion for attorney fees. Callahan & Blaine asked the court to award fees in the lodestar amount of $7,967,340.55 plus an enhancement multiplier of 1.5, and costs of $789,796.88 ($7,967,340.55 + $789,796.88 = $8,757,137.43).  Plaintiffs' cocounsel, Cadena Churchill, filed a separate motion for attorney requesting fees in the lodestar amount of $152,559.25, plus an enhancement multiplier of 1.5, and costs of $5,501.09.

71

plaintiff incurred in prosecuting a prior appeal because the requirements of benefiting a large class of persons and financial burden were not at the trial stage of the case; it was only "at the appellate level the case implicated the public interest and where it might not have made economic sense to proceed without the incentive of an attorney fee award should the appeal prove successful." (*Id.* at p. 17.) *Protective League* is distinguishable because the financial burden and public or large-class benefit requirements in the present case were satisfied at the trial stage and not only on appeal.

In any event, we need not decide at this point whether an award of attorney fees under section 1021.5 should only take account of lodestar fees incurred *after* the financial burden requirement is satisfied—i.e., in this case after the motion for class certification was decided. The trial court found "an award of fees at 25% of [plaintiffs' common fund] would not be inequitable," and, accordingly, ordered that 25 percent of plaintiffs' attorney fee award was "recoverable from [plaintiffs'] common fund in the amount of $1,250,000,00." From this we can infer that the court took into account plaintiffs' counsel's financial incentive at the beginning of the litigation in exercising its equitable discretion to apportion fees between UT and the common fund, rather than ordering UT to pay the entire fee award.

Although we find no abuse of discretion in the court's determination that the requirements of section 1021.5 to justify a fee award were satisfied, we conclude the trial court should reconsider the amount of the award in light of the possible reduction of plaintiffs' monetary award on remand. We understand that in doing so, the court will evaluate " 'a number of factors, including the nature of the litigation, its difficulty, the

72

amount involved, the skill required in its handling, the skill employed, the attention given, *the success or failure*, and other circumstances in the case.' " (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096, italics added.)[36] Because the degree of success plaintiffs will achieve after redetermination of their monetary award on remand may change, the court's assessment of the degree of success achieved by plaintiffs' counsel could also change. (*Sokolow v. County of San Mateo* (1989) 213 Cal.App.3d 231, 248 [the degree or extent of plaintiffs' success in obtaining the results they sought must be taken into consideration in determining the reasonable amount of their attorney fee award].) In addition, plaintiffs are entitled to an award of attorney fees incurred on appeal. (*Protective League, supra*, 188 Cal.App.3d at p. 17.)

UT contends the court improperly awarded fees to plaintiffs for both successful and unsuccessful claims that were unrelated, and that even if the claims were related, the court should have reduced the fee award for plaintiffs' limited success. "California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees. [Citation.] 'Although fees

---

[36]    "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. 'California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award.' [Citation.] The reasonable hourly rate is that prevailing in the community for similar work. [Citations.] The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*PLCM, supra*, 22 Cal.4th at p. 1095.)

73

are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims [citation], "under state law as well as federal law, a reduced fee award is appropriate when a claimant achieves only limited success." ' [Citations.] The trial court may reduce the amount of the fee award 'where a prevailing party plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit.' " (*Environmental Protection Information Center v. California Dept. of Forestry and Fire Protection* (2010) 190 Cal.App.4th 217, 238 (*Environmental Protection*).)

California courts applying section 1021.5 in cases of limited success have adopted a two-step inquiry set forth in *Hensley v. Eckerhart* (1983) 461 U.S. 424 (*Hensley*). (*Environmental Protection, supra*, 190 Cal.App.4th at pp. 238–239.) The first step inquiry is to determine whether the prevailing party's unsuccessful claims are related to its successful ones. (*Id.* at p. 239.) If the different claims are based on different facts and legal theories, they are unrelated; if they involve a common core of facts or are based on related legal theories, they are related. (*Ibid.*)

If successful and unsuccessful claims are related, the second step of the *Hensley* inquiry is to determine "whether 'the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.' [Citation.] In this step, the court will 'evaluate the "significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." ' [Citations.] Full compensation may be appropriate where the plaintiff has obtained 'excellent results,' but may be excessive if 'a plaintiff has achieved only partial or limited success.' [Citation.] 'The court may appropriately reduce the lodestar calculation "if the relief, however

74

significant, is limited in comparison to the scope of the litigation as a whole." ' " (*Environmental Protection, supra*, 190 Cal.App.4th at p. 239.)

The court's attorney fee order does not reflect that the court applied the *Hensley* two-step inquiry or otherwise considered plaintiffs' limited success in determining the amount of their fee award. Consequently, in redetermining the amount of the fee award in light of plaintiffs' reduced monetary recovery, the court should also consider whether the award should be reduced by the amount of any fees that were attributable to unsuccessful claims that were unrelated to successful claims.

UT contends the court erred by adopting plaintiffs' lodestar amount in awarding attorney fees. Plaintiffs respond that the court did not fully adopt its lodestar—i.e., all of the fees they sought—and that the court's lodestar determination was correct. Understanding that the trial court's calculation of allowable hours may change on remand, we find no abuse of discretion in the manner in which court made the lodestar determination.

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. ' " (*PLCM Group v. Drexler, supra*, 22 Cal.4th at p. 1096.) The trial court's exercise of discretion in deciding whether to increase or reduce the lodestar figure "will not be disturbed unless the appellate court is convinced the award is clearly wrong." (*Downey Cares v. Downey*

*Community Development Com.* (1987) 196 Cal.App.3d 983, 994; *PLCM,* at p. 1095 [" 'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong." ' "].) A reviewing court is "entitled to presume the trial court considered all the appropriate factors in choosing the multiplier and applying it to the whole lodestar." (*Downey Cares v. Downey,* at p. 998.)

In its order awarding attorney fees, the court stated it had "carefully reviewed the billing information submitted by plaintiff, and [had] considered the motions papers and exhibits submitted." The court further stated: "The Court declines to rely on expert opinions, as this Court is thoroughly familiar with this case and has adjudicated attorney fee requests in many other cases." After noting there was "no evidence of pre-litigation settlement offers," the "litigation was fiercely fought," and "[p]re-litigation attempts to settle would likely have been futile[,]" the court "calculate[d] 11,695.75 hours of attorney time as reasonable." The court excluded time for work performed by nonattorneys and determined "that an across-the-board blended hourly rate of $500 [was] a reasonable rate, considering the various rates throughout the four years, and considering counsel's experience and the standards within the community." Bearing in mind that the experienced trial judge is the best judge of the value of professional services rendered in the trial court (*PLCM, supra*, 22 Cal.4th at p. 1095), we find nothing "clearly wrong" with the court's lodestar determination, although the attorney fee award must be reconsidered for the reasons discussed above.

I. *Denial of Enhancement of Attorney Fee Award*

Plaintiffs contend the court abused its discretion in not awarding an enhancement of the lodestar amount of their attorney fees. As we discussed above, we will not disturb the trial court's exercise of discretion in deciding whether to increase or reduce the lodestar figure unless the fee award is clearly wrong (*PLCM, supra*, 22 Cal.4th at p. 1095), and we may "presume the trial court considered all the appropriate factors in choosing the multiplier and applying it to the whole lodestar." (*Downey Cares v. Downey Community Development Com., supra*, 196 Cal.App.3d at p. 998.)

Plaintiffs complain that the trial court did not consider the factors that, in their words, "trial courts must consider in ruling on a fee enhancement request." The factors that plaintiffs specify are: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*), citing *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 (*Serrano III*).) The *Ketchum* court noted that the lodestar "*may be adjusted by the court based on* [those] factors . . . ." (*Ketchum*, at p. 1132.)[37]

---

[37] The California Supreme Court has not carved these factors "into concrete or barred consideration of other relevant and nonduplicative factors; nor have the courts of appeal sought to do so. On the contrary, . . . the Supreme Court [has] described the factors . . . as among those 'the trial court *may* consider in adjusting the lodestar figure.' " (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 40–41, quoting *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322, fn. 12.)

The *Ketchum* court also noted: "Of course, the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof. In each case, the trial court should consider whether, and to what extent, the attorney and client have been able to mitigate the risk of nonpayment, e.g., because the client has agreed to pay some portion of the lodestar amount regardless of outcome. It should also consider the degree to which the relevant market compensates for contingency risk, extraordinary skill, or other factors under *Serrano III*. We emphasize that when determining the appropriate enhancement, a trial court should not consider these factors to the extent they are already encompassed within the lodestar. The factor of extraordinary skill, in particular, appears susceptible to improper double counting; for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar. A more difficult legal question typically requires more attorney hours, and a more skillful and experienced attorney will command a higher hourly rate. [Citation.] Indeed, the ' "reasonable hourly rate [used to calculate the lodestar] is the product of a multiplicity of factors . . . the level of skill necessary, time limitations, the amount to be obtained in the litigation, the attorney's reputation, and the undesirability of the case." ' [Citation.] Thus, *a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in*

78

*unfair double counting and be unreasonable.  Nor should a fee enhancement be imposed*

*for the purpose of punishing the losing party.*"  (*Ketchum, supra*, 24 Cal.4th at pp. 1138–

1139, italics added.)

In the present case, we cannot say the trial court's decision to not enhance the

lodestar was clearly wrong.  The court reasonably could have viewed the *Serrano III*

factors of the difficulty of the questions involved, the skill displayed in presenting them,

and the extent to which the litigation precluded other employment as being encompassed

in the lodestar, and could reasonably decide that the quality of the representation

provided by plaintiffs' counsel was comparable to the quality that would have been

provided by counsel of comparable skill and experience billing at the hourly rate used in

the lodestar calculation.  The court did not abuse its discretion in denying plaintiffs'

request to enhance the lodestar.

II. *Recovery of Attorney Fees Under Section 2802*

Plaintiffs contend the court erred in ruling they could not recover attorney fees under Labor Code section 2802. Plaintiffs state in their opening brief that they "preserve this issue because if [this] Court for some reason reverses the trial court's award of attorney's fees under . . . section 1021.5, Plaintiffs reserve the right to seek these fees under . . . section 2802 . . . ." Although we are reversing the attorney fee award with directions to redetermine the award, we are not reversing the trial court's decision to award attorney fees under section 1021.5. Consequently, we will not address plaintiffs' contention that they are entitled to recover attorney fees under section 2802, other than to express our view that the court reasonably found plaintiffs abandoned their section 2802 cause of action by electing to seek recovery solely under section 17200, as the court fully explained in its January 21, 2014 order awarding attorney fees.

DISPOSITION

The portions of the judgment awarding the class members the principal sum of $3,188,445 plus prejudgment interest and attorney fees in the amount of $6,160,416 are reversed and the matter is remanded. The court is directed to redetermine the amount of the class award and prejudgment interest consistent with the views expressed in this opinion, including reducing the award by the amount of any documented and readily identifiable payments, credits, or reversals in the subject expense categories that UT is able to show the class members received, and disallowing recovery for insert credits. The court is further directed to redetermine attorney fees consistent with the views expressed in this opinion, taking into consideration any reductions in the class monetary recovery

on remand and whether the fee award should be reduced by the amount of any fees that were attributable to unsuccessful claims that were unrelated to successful claims.  In all other respects, the judgment is affirmed.  Plaintiffs are awarded their costs on appeal.


McCONNELL, P. J.

WE CONCUR:


HALLER, J.


DATO, J.